[No. B227712. Second Dist., Div. Four. June 8, 2012.]

CHRISTOPHER A. COLE, Plaintiff and Appellant, v.
PATRICIA A. MEYER & ASSOCIATES, APC, et al., Defendants and
Appellants.

[No. B230271. Second Dist., Div. Four. June 8, 2012.]

CHRISTOPHER A. COLE, Plaintiff and Appellant, v.
KIESEL, BOUCHER, & LARSON et al., Defendants and Respondents.

1096

1098

**COUNSEL**

Bewley, Lassleben & Miller, Leighton M. Anderson and David A. Brady for Plaintiff and Appellant.

Wingert Grebing Brubaker & Juskie, Charles R. Grebing and Eric R. Deitz for Defendants and Appellants.

Nemecek & Cole, Jonathan B. Cole, Mark Schaeffer and Frances Ma for Defendants and Respondents Kiesel, Boucher & Larson and Raymond P. Boucher.

Reback, McAndrews, Kjar, Warford & Stockalper, James J. Kjar and Albert E. Cressey III for Defendant and Respondent Robert P. Ottilie.

**OPINION**

**EPSTEIN, P. J.**—This case involves causes of action for malicious prosecution and defamation against attorneys of record in a prior case. As to the causes of action for malicious prosecution, we hold, among other things, that the attorneys' anti-SLAPP[1] special motions to strike (Code Civ. Proc., § 425.16.) were improperly granted, and that attorneys who appear on all of the pleadings and papers filed for the plaintiffs in the underlying case cannot avoid liability for malicious prosecution merely by showing that they took a passive role in that case as standby counsel who would try the case in the event it went to trial.

Christopher A. Cole filed a complaint for malicious prosecution and defamation against the following defendants: Patricia A. Meyer & Associates, APC (formerly known as Aguirre & Meyer, hereafter Meyer & Associates), Patricia A. Meyer and Michael Aguirre (collectively the Meyer defendants);

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737] (*Jarrow*).)

Kiesel, Boucher, & Larson, and Raymond P. Boucher (collectively the Boucher defendants); and Robert P. Ottilie. Defendants were the attorneys of record for plaintiffs in a prior shareholder action against Cole and other directors of Peregrine Systems, Inc. (Peregrine), a software company that declared bankruptcy after engaging in massive accounting fraud.

The trial court granted the anti-SLAPP motions by the Boucher defendants and Ottilie to strike Cole's complaint. The court denied the Meyer defendants' anti-SLAPP motion, except as to the defamation claim against Aguirre. Cole appeals the striking of his malicious prosecution claims against the Boucher defendants and Ottilie. The Meyer defendants cross-appeal from the partial denial of their anti-SLAPP motion.

We find that Cole has shown the requisite likelihood that he will prevail on his malicious prosecution claims against all defendants, and on his defamation claim against Meyer and Meyer & Associates. We reverse the court's September 9, 2010 order to the extent it struck the malicious prosecution claims against the Boucher defendants and Ottilie and awarded Ottilie attorney fees and costs. We affirm the order in all other respects.

Cole also appeals from the separate order awarding the Boucher defendants attorney fees and costs for their anti-SLAPP motion. We reverse this award and remand the matter for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL SUMMARY

Cole founded Peregrine in San Diego, California, in 1981.[2] Throughout the 1980's, he held management positions and served as the company's president before resigning in 1989. His subsequent involvement with the company was largely as a shareholder and outside director.

Peregrine became a publicly traded company in 1997. Some of its revenue growth was due to software sales to resellers, known as "channel sales." In 1999, the company began recognizing revenue at the time of the original sale to a reseller, known as a "sale in" to the channel, rather than at the time of sale to the end user, known as a "sale through" the channel. It improperly

---

[2] The trial court overruled defendants' general objections to the comprehensive declarations of Cole and his attorney, and it sustained only some of the many evidentiary objections to specific portions of these declarations. No party has challenged these evidentiary rulings on appeal. To the extent that we rely on the two declarations, we draw only on statements of fact to which specific objections were either overruled or not made at all.

recognized revenue from "sales in" to a channel without an end user's firm commitment to buy or with side agreements. These and other contingencies made revenue collection highly uncertain. To cover uncollectible receivables, the company sold them to banks with recourse and disguised large writeoffs as acquisition costs. It also engaged in inflated "barter transactions" with other software companies, structured so that both companies could recognize revenue.

After improper transactions came to light in 2002, the Peregrine board of directors commissioned an independent investigation into the company's practices. The investigation resulted in a report by the law firm Latham & Watkins (the Latham report). This report was based on approximately 86 interviews, 897,000 e-mail messages generated between 1996 and 2002, and analysis of 170 suspect transactions. The Latham report found no evidence that the outside directors knew of management's improper business and accounting practices. It also found that Cole had sold Peregrine stock whenever trading was allowed in order to fund his other software startup companies. During the investigation, Peregrine announced that it would restate its earnings since 2000. It then filed for bankruptcy and in 2005 was acquired by Hewlett-Packard.

In 2003, defendants sued Cole and other Peregrine directors on behalf of individual Peregrine shareholders. The action was filed in San Diego County Superior Court. The first amended complaint was the first charging pleading actually served on Cole. It included eight common law and statutory fraud and fraud-related causes of action: fraud and deceit by active concealment, fraud and deceit based upon omission and misrepresentations of material facts, violations of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), aiding and abetting, and conspiracy. Four causes of action were for negligent misrepresentation, breach of fiduciary duty, aiding and abetting that breach, and violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). The same 12 state law causes of action were carried over into subsequent amendments of the complaint.[3]

The first amended complaint alleged that Cole was actively involved in the day-to-day operations of Peregrine and advised management about the company's operations; he set aggressive financial goals for the company by encouraging false or misleading revenue recognition reporting; he attended 38 board meetings from 1999 through 2002, at which false or misleading revenue recognition was discussed; and in the same period, he sold 1.2 million shares of stock for a total of over $28.8 million, thus becoming one of the principal beneficiaries of the fraud. In 2004, the second amended complaint expanded these allegations in several directions: it alleged that the

---

[3] The original complaint and the third amended complaint are not in the record.

board of directors encouraged channel sales in 1997, approved a sell-in rather than sell-through recognition of revenue from such sales in April 1999, and was aware of the increase of unsold inventory in the channel in October 1999. Cole was alleged to have been instrumental in developing Peregrine's business model and in establishing its revenue recognition policy. He was alleged to have shredded materials distributed at board meetings and approved "doctoring" the minutes to eliminate any incriminating information. Cole was specifically alleged to have engaged in insider trading with respect to Peregrine's acquisition of the Harbinger Corporation in April 2000 and the Department of Justice's investigation of Peregrine's business partner Critical Path in February 2002.

The fourth amended complaint, filed at the end of 2005, restated these allegations against Cole without a significant substantive change. Since Aguirre had left private practice, his name did not appear on this complaint or subsequent filings, and his former law firm appeared under the name Meyer & Associates. Cole's motion for summary judgment was tentatively granted in 2006, but a final decision did not issue until the end of 2007 because the matter was repeatedly continued upon the request of plaintiffs' attorneys. The court concluded that plaintiffs had failed to raise a triable issue of material fact that, between 1999 and 2001, Cole knew of the fraud at Peregrine, had day-to-day control over its operations, or had a special relationship with the company. In ruling on the motion, the court specifically rejected as irrelevant the declarations of two former Peregrine employees who claimed Cole engaged in dishonest business practices when he managed Peregrine in the 1980's.

The summary judgment in favor of Cole and two other outside directors was affirmed in *Bains v. Moores* (2009) 172 Cal.App.4th 445 [91 Cal.Rptr.3d 309] (*Bains*). The appellate court concluded that the plaintiffs had failed to raise a genuine issue of material fact on any fraud or fraud-related claim. (*Id.* at p. 454.) Specifically, the court found that Cole's sale of stock in February 2000 was not suspicious and therefore was not evidence of scienter for the purpose of establishing fraud. (*Id.* at pp. 464–465.) The court found that, at most, the plaintiffs had shown the Peregrine board of directors had been advised about concerns over the company's prospects and its method of recognizing revenue for channel sales, but not of any discrete piece of information material to the company's share price. (*Id.* at p. 461.) The court noted that even the plaintiffs' expert did not conclude the outside directors knew of the fraud at Peregrine. (*Id.* at p. 468.) The court deemed speculative the plaintiffs' argument that they had been hampered in discovery because 28 key witnesses had exercised their privilege against self-incrimination. (*Id.* at pp. 480, 486.)

In April 2010, Cole sued the attorneys of record in *Bains* for malicious prosecution and defamation. On September 9, 2010, the trial court granted the Boucher defendants' and Ottilie's anti-SLAPP motions based on their representation that they did not participate in *Bains*, having been associated in the case only for purposes of trial. The court denied Cole's request for limited discovery into these defendants' actual participation in the case. It granted the motion to strike the defamation claim as to the Boucher defendants, Ottilie, and Aguirre because they were not liable for the posting of the fourth amended complaint on the Web site of Meyer & Associates, where it could be accessed even after *Bains* was no longer pending. The court ruled that the Boucher defendants and Ottilie were entitled to attorney fees for their anti-SLAPP motions and awarded Ottilie $7,895 in fees. The court concluded that Cole was likely to prevail on his malicious prosecution claim against the Meyer defendants (including Aguirre). Cole timely appealed and the Meyer defendants cross-appealed.

On November 15, 2010, the court granted the Boucher defendants' and Aguirre's motions for attorney fees and costs. Cole submitted on the court's tentative award of fees and costs to Aguirre, which was limited to the defamation claim. Cole then noticed an appeal from the minute order. The signed order awarding attorney fees to the Boucher defendants was filed on November 22, 2010.

## DISCUSSION

### I

■ Code of Civil Procedure section 425.16 provides that a cause of action arising from a defendant's act in furtherance of a constitutionally protected right of free speech may be stricken unless the plaintiff is likely to prevail on the merits. (Code Civ. Proc., § 425.16, subd. (b)(1).) The analysis of an anti-SLAPP motion under this section is two-fold: the trial court decides first " 'whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Jarrow, supra*, 31 Cal.4th at p. 733.)

To meet his burden, the plaintiff " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not *weigh* the credibility

or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], superseded by statute on other grounds as noted in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 547 [59 Cal.Rptr.3d 109].)

We review an order granting an anti-SLAPP motion de novo, applying the same two-step procedure as the trial court. (*Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 663 [132 Cal.Rptr.3d 781].) We look at the pleadings and declarations, accepting as true the evidence that favors the plaintiff and evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30] (*Soukup*).) The plaintiff's cause of action needs to have only " 'minimal merit' [citation]" to survive an anti-SLAPP motion. (*Id.* at p. 291.)

## II

Cole concedes that a cause of action for malicious prosecution is subject to an anti-SLAPP motion. (See *Jarrow, supra,* 31 Cal.4th at p. 735.) His complaint contains two such causes of action: one based on the filing of the *Bains* case and another based on plaintiffs' opposition to his summary judgment motion in *Bains*. The question is whether he has made a prima facie evidentiary showing of a probability of prevailing on one or both of these causes of action.

To prevail, Cole must demonstrate that, as to him, the *Bains* case "(1) was commenced by or at the direction of the defendant[s] and was pursued to a legal termination favorable to [Cole]; (2) was brought without probable cause; and (3) was initiated with malice. [Citation.]" (*Soukup, supra,* 39 Cal.4th at p. 292.) He also may prevail by showing that defendants maliciously continued to prosecute the case against him, in the trial court and on appeal, without probable cause. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 969, 973 [12 Cal.Rptr.3d 54, 87 P.3d 802].)

There is no dispute that *Bains* was favorably terminated as to Cole, but the Meyer defendants have cross-appealed from the trial court's finding that they instituted and continued to prosecute the case against Cole without probable cause and with malice. The Boucher defendants and Ottilie argue they cannot be liable for malicious prosecution because they did not take an active part in *Bains* and reasonably relied on the Meyer defendants' decision to sue Cole.

We conclude that Cole has shown the requisite likelihood of prevailing on his malicious prosecution claims against all defendants.

## A. *Probable Cause*

Probable cause exists when a lawsuit is based on facts reasonably believed to be true, and all asserted theories are legally tenable under the known facts. (*Soukup, supra*, 39 Cal.4th at p. 292.) Thus, Cole may prevail by making a prima facie showing that any one of the theories in *Bains* was legally untenable or based on facts not reasonably believed to be true. (See *ibid.*) This objective standard of review is similar to the standard for determining whether a lawsuit is frivolous: whether "any reasonable attorney would have thought the claim tenable . . . ." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 885–886 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*).)

■ The parties' dispute focuses on the fraud and fraud-related claims in *Bains*. Specifically, the parties disagree whether the attorneys in that case had probable cause to believe that Cole knew of, encouraged, or participated in the fraud at Peregrine. A common law fraud cause of action requires: " ' "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' [Citation.]" (*Philipson & Simon v. Gulsvig* (2007) 154 Cal.App.4th 347, 363 [64 Cal.Rptr.3d 504].) Scienter also is necessary for liability under Corporations Code sections 25400 and 25500, which together require "an intent to defraud through a knowingly false statement" designed to manipulate the securities markets. (*California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 108, 112 [113 Cal.Rptr.2d 915].) ■ Actual knowledge and concurrence in a planned tortious scheme are required for civil conspiracy. (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 823 [32 Cal.Rptr.3d 325].) Aiding and abetting a tort requires knowingly assisting the wrongful act. (*Id.* at p. 823, fn. 10.)

In both *Bains* and this case, Cole has maintained that he was sued only because he attended board meetings and sold stock during the relevant period, and the specific allegations of fraud against him were concocted in bad faith to take the case against him past the demurrer stage. The Meyer defendants' declarations in support of the anti-SLAPP motions indicate that, indeed, there was no direct evidence of Cole's involvement in Peregrine's fraudulent operation, and the allegations against him were strictly circumstantial. Evidence is not insufficient merely because it is circumstantial. The question is whether it was sufficient in this case.

Meyer, the lead attorney in *Bains*, explains that "Cole was named a defendant in *Bains* because of his long-standing role as a founder, officer and

director of Peregrine; his intimate knowledge of the company's operations; his attendance at a critical meeting of the Peregrine board of directors in April of 1999; his approval of erroneous, false and fraudulent reports as a member of the company's board of directors; and the suspicious timing of his sale of large blocks of Peregrine stock before the public disclosure of negative financial results for the corporation." Both Meyer and Aguirre conclusorily declare that they relied on "the reasonable inferences" drawn from "information acquired through investigation and discovery." Their declarations fail to demonstrate that the fraud allegations against Cole were supported by probable cause at any time. They demonstrate, rather, that the attorneys drew logically flawed inferences from known facts or stretched those facts to fit their fraud-based theories.

### 1. *Insider Trading*

While Cole's trading of stock was an easy target, defendants have been unable to pinpoint what makes it suspicious. Cole declared that he regularly sold stock between 1999 and 2002 to raise money for his other business ventures, but only when he had a clearance from the Peregrine's legal department. To the extent that the Peregrine stock price was fraudulently inflated during that period, he benefited from it, but that does not automatically establish he had knowledge of the fraud.

As noted in *Bains*, no California authority makes insider trading relevant to scienter. (*Bains, supra*, 172 Cal.App.4th at p. 456.) The *Bains* court assumed, based on federal authority, that suspicious or unusual insider trading may be probative on the issue, depending on the amount and percentage of shares sold, the timing of the sales, and the insider's trading history. (*Bains, supra*, 172 Cal.App.4th at pp. 456, 458, citing *Zucco Partners, LLC v. Digimarc Corp.* (9th Cir. 2009) 552 F.3d 981, 1005 (*Zucco Partners*).) To be suspicious, the sales must have been " ' "calculated to maximize the personal benefit from undisclosed inside information." ' " (*Zucco Partners*, at p. 1005.)

The *Bains* complaint did not allege Cole's trading history between 1997, when Peregrine's stock became publicly traded, and 1999, the first year of allegedly suspicious trading. This precludes a meaningful comparison with his early trading. In 1999, Cole sold approximately 270,000 shares. The sales were spread over three months (Feb., July, and Aug.), and the price per share ranged from $23.68 to $34.72. In February 2000, Cole sold another 270,000 shares at $44.22 to $50.33 per share. He sold no more stock that year even though the price per share was as high as $79.50 in March 2000. Cole sold 99,000 shares at $30.03 to $30.56 per share in February 2001, and 112,000 shares at $18.14 to $18.58 per share in November 2001—a total of 211,000

shares that year. Between February 5 and 14, 2002, he sold 500,000 shares in five increments at $7.05 to $7.62 per share. He was left holding over a million shares of Peregrine stock.

Cole's February 2000 sale of 270,000 shares garnered the highest price per share of all his sales, but the Meyer defendants have been unable to tie it to any material undisclosed information that would implicate Cole in the fraud scheme underway at Peregrine at the time. The complaint alleged that the sales were based on undisclosed information about Peregrine's planned acquisition of the Harbinger Corporation, which was publicly announced in April 2000 and negatively received by investors. The complaint did not allege the Harbinger acquisition was contemplated for fraudulent purposes. On appeal from the summary judgment in *Bains*, the focus shifted from this acquisition to concerns about Peregrine's health and its accounting method that had been brought to the board's attention in January 2000. (*Bains, supra*, 172 Cal.App.4th at pp. 462–463.) In her declaration in this case, Meyer shifted the focus again, this time tying the February 2000 sale of stock to Peregrine's acquisition of the Barnhill Management Group, which the board allegedly approved in January 2000. According to Meyer, Douglas Powanda, Peregrine's executive vice-president of worldwide sales, admitted he and unidentified others intended to conceal more than $8 million in uncollectible receivables through this acquisition. But even accepting Meyer's representation of the substance of Powanda's guilty plea agreement, there still is no evidence that the board was apprised of management's true basis for the acquisition. Moreover, as the *Bains* court noted, Cole's sale of stock in February 2000 was not out of line with his trading during the previous year. (*Bains, supra*, 172 Cal.App.4th at p. 464.) Nor can it be said that Cole maximized his personal benefit from any undisclosed information since the price per share almost doubled in the month after he traded, reaching its peak in March 2000.

The *Bains* complaint alleged that Cole's February 2002 sale of 500,000 shares was based on material information—the Department of Justice's press release about its investigation of Peregrine's trade partner Critical Path, which implicated Peregrine in a "software swap." Although the complaint alleged that Cole was trading on material nonpublic information, the Department of Justice's press release was publicly available.

Cole's total trades between 1999 and 2001 disposed of roughly one-third of his stock, and his substantial trades in February 2002 occurred after publicly available information already had depressed the value of the stock. He held almost half of his original shares when the company's stock collapsed. His trading patterns and overall trading history are not per se suspicious under the federal authorities on which the *Bains* plaintiffs relied.

(See *Metzler Investment GMBH v. Corinthian Colleges, Inc.* (9th Cir. 2008) 540 F.3d 1049, 1067 ["[Defendant] sold only 37 [percent] of his total stock holdings during the Class Period. We typically require larger sales amounts . . . to allow insider trading to support scienter."]; *Provenz v. Miller* (9th Cir. 1996) 102 F.3d 1478, 1481 [president traded six times more shares than in year before company disclosed it had overstated its revenue]; *Kaplan v. Rose* (9th Cir. 1994) 49 F.3d 1363, 1379–1380 [president and CEO disposed of all or substantially all of their stock before release of negative test results of company's medical product].)

When they initiated *Bains*, the Meyer defendants had information about Cole's trading history that did not reasonably support an inference of scienter under federal or state authority. They point to the other shareholders' actions filed against Cole in the same time period to justify naming Cole as a defendant in *Bains*. Principally, they rely on *Peregrine Litigation Trust v. Moores*, consolidated case No. GIC788659 (*Litigation Trust*), another case filed in San Diego County Superior Court. That case stemmed from Peregrine's earlier bankruptcy and included claims of insider trading and gross mismanagement against Cole and other directors. Most claims were directed against John J. Moores, an outside director and the largest Peregrine shareholder, who directly or indirectly sold or transferred close to 20 million shares during the relevant period. The *Litigation Trust* complaint made no direct allegations of fraud against Cole, nor did it include fraud claims of the kind at issue here. It eventually was settled without admission of liability, along with a consolidated federal class action, *In re Peregrine Systems, Inc. Securities Litigation*, case No. 02 CV 0870-BEN (RBB), about which the Meyer defendants provide no information.

Although they argue generally that all cases against Cole stemmed from the same set of facts, the Meyer defendants do not meaningfully compare the causes of action in *Bains* with those in other cases. The fact that other attorneys named Cole as a defendant in other causes of action, which were settled before final adjudication, does not demonstrate that the fraud and fraud-based causes of action the Meyer defendants chose to allege against him in *Bains* were factually or legally tenable. (See *Soukup, supra*, 39 Cal.4th at pp. 294–295 [deeming irrelevant rulings on causes of action in prior suit without collateral estoppel effect on issue of probable cause].)

2. *Group Published Information Doctrine*

According to Meyer, Cole was named as a defendant in *Bains* because he approved false financial reports as a member of Peregrine's board of directors. In *Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 207–208 [114 Cal.Rptr.2d 127], the court reasoned by analogy to federal securities law that outside

directors are not liable for false or misleading corporate statements under Corporations Code sections 25400 and 25500 just because they reviewed, approved or signed them. Thus, under existing law, Cole could not be held vicariously liable for the company's fraudulent financial statements.

The Ninth Circuit applies a group published information presumption at the pleading stage. It presumes outside directors are liable for publicly released false corporate statements if they "either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." (*In re GlenFed, Inc. Securities Litigation* (9th Cir. 1995) 60 F.3d 591, 593.) The *Bains* court recognized that the validity of this presumption is unclear since the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4) heightened the pleading standards for securities class action lawsuits. (*Bains, supra,* 172 Cal.App.4th at p. 474.) Assuming that the presumption would apply to fraud claims under California law, the court concluded that it did not apply past the pleading stage. (*Id.* at p. 476.)

As the *Bains* court noted repeatedly, the plaintiffs in that case were in uncharted territory since there was no California authority on the subject. The unclear validity and applicability of the group published information presumption turned the lawsuit against the outside directors into a legal gamble. But even assuming, as the *Bains* court did, that the presumption applied at the pleading stage, the question is whether the attorneys in the *Bains* case could allege in good faith that Cole participated in the day-to-day corporate activities, or in preparing or communicating the company's publicly released information at particular times.

The Meyer defendants make no such showing. Instead, they maintain conclusorily that Cole was named in the *Bains* complaint because he attended a critical board meeting in April 1999, without explaining what made this meeting critical. The *Bains* complaint alleged that at a meeting on April 22, 1999, the board was advised that Peregrine would not meet its financial goals for the final quarter of 1999, the fiscal year that had ended three weeks earlier, unless it changed from a sell-through to a sell-in method of accounting for channel sales. The board was advised that the sell-in method was not "preferred." The *Bains* complaint assumed incorrectly that the sell-in method of revenue recognition violates generally accepted accounting principles (GAAP) per se rather than as fraudulently used by Peregrine's management. But the method violates GAAP only if used to book revenue in the absence of a binding contract, product delivery, fixed or determinable payment, and

probable collection. The complaint alleged, again in conclusory terms, that the board approved the sell-in method knowing that Peregrine's channel sales were contingent, without specifically alleging that anyone had brought this fact to the board's attention.

Because the Meyer defendants do not present any evidence about what was actually said at the April 1999 board meeting, it is impossible to judge the reasonableness of the allegations in the complaint. For instance, it is unclear whether the board approved the sell-in method for future quarters or only for the last quarter of the 1999 fiscal year, which is outside the 2000 to 2002 period for which revenue eventually had to be restated. It also is unclear whether the board was advised that the method would be applied to contingent or other improper transactions disguised as sales. Cole has denied that he approved the sell-in method knowing that it would be used to fraudulently book revenue. The conclusory allegations in the *Bains* complaint do not establish that the attorneys had probable cause to believe otherwise.

The Meyer defendants maintain that they sued Cole because he founded Peregrine and was involved in its management until 1989, some 10 years before the fraudulent practices at issue in *Bains* began. Cole has consistently denied all allegations that he was involved in Peregrine's management, day-to-day operations, or preparation of public statements in the relevant period.[4] The complaints filed in *Bains* variously alleged that, in that period, he lived in San Diego and California, whereas he actually lived in Newport Beach, California, and then in Massachusetts, making it much less likely that he was physically present at the corporate headquarters in San Diego on a daily basis. He did not have an office at Peregrine, did not advise the company's CEO, was not a member of the audit committee, and only attended board meetings. He did not prepare financial documents or press releases. He relied on management's assurances that Peregrine's financial statements had been prepared in accordance with accepted accounting principles and had been approved by the company's auditors. He first learned of any impropriety on February 13, 2002, when he read a news report about the "software swap" between Peregrine and Critical Path and was told the same day that the audit committee had launched an internal investigation.

---

[4] Cole was deposed on January 30, 2003, in relation to Peregrine's bankruptcy. The trial court in this case did not allow Cole to lodge a copy of his deposition taken in the bankruptcy case, but it overruled defendants' objections to the portion of his declaration summarizing his deposition testimony. Since the relevant information is in the record, we do not consider Cole's contention that the trial court abused its discretion in not accepting the copy of the entire deposition.

The Meyer defendants offer no contrary evidence. They rely instead on the declarations of two former Peregrine employees to argue that during his tenure in management in the 1980's, Cole engaged in various improper business practices: he allegedly manipulated software prices and backbooked later acquired contracts to earlier fiscal quarters. They then insinuate that the practices he instituted in the 1980's continued in the late 1990's. Purporting to summarize Powanda's guilty plea agreement, Meyer states that Powanda "admitted that he and others engaged in a practice originated by, *inter alia*, Mr. Cole, that involved improperly keeping Peregrine's books 'open' past the end of the quarter, then back-dating later-acquired contracts to make it appear they were executed before the end of the prior quarter in order to bolster quarterly revenues."

There are several problems with this evidence. First, it is unclear when the former employees' declarations were obtained. Dated in 2006, they were first offered in support of the opposition to Cole's summary judgment motion in *Bains* and thus cannot provide probable cause for initiating the case against Cole three years earlier.[5] Second, it is unclear when Powanda pled guilty and, if his plea agreement was available, why it was not used in *Bains*. Third, Meyer fails to provide the actual language of Powanda's admission, and the briefs on appeal indicate that Powanda did not directly implicate Cole. Rather, Meyer appears to have editorialized to supply a link between Cole's alleged improper practices in the 1980's and Peregrine management's improper practices a decade later.

The trial court in *Bains* rejected the declarations as too remote and irrelevant. This evidentiary ruling was not challenged on appeal. (*Bains, supra,* 172 Cal.App.4th at pp. 449–486.) Even so, the Meyer defendants argue that based on these declarations they could reasonably expect to uncover admissible evidence about Cole's involvement in the fraud at Peregrine. The declarations give rise to a speculative inference that because Cole engaged in an improper accounting practice when he managed the company in the 1980's, he must have known of the accounting fraud at Peregrine between 1999 and 2002. Keeping the books open past the end of a quarter was only one part of the large-scale fraudulent scheme in the latter period. There is no evidence that the practice of backdating sales was so unusual that it could be traced back only to Cole, or that it survived unchanged over the decade during which Cole was not involved in managing the company while it grew, diversified, and became publicly traded.

---

[5] Although not determinative of the reasonableness of defendants' beliefs, Cole has denied that he ever engaged in the improper practices attributed to him.

■ In a malicious prosecution case where the issue is the insufficiency of the facts known to the defendant, "probable cause requires evidence sufficient to prevail in the action or at least information reasonably warranting an inference there is such evidence." (*Puryear v. Golden Bear Ins. Co.* (1998) 66 Cal.App.4th 1188, 1195 [78 Cal.Rptr.2d 507].)[6] To be reasonable, an inference " ' "cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork." ' " (*Shandralina G. v. Homonchuk* (2007) 147 Cal.App.4th 395, 411 [54 Cal.Rptr.3d 207].)

Cole has made a prima facie showing that the Meyer defendants had no evidence implicating him in the fraud scheme at Peregrine. Defendants have failed to show that they had any information that reasonably led them to believe that there was such evidence. They have not shown that they had a plausible reason to believe Cole was involved in Peregrine's day-to-day operations or that he participated in preparing Peregrine's publicly released statements. An examination of his trading history should have made it clear that he traded regularly in numbers that were not suspicious under federal securities law. Defendants have not shown that any other lawsuit against Cole was based on such sweeping allegations of fraudulent activity against him as was theirs. Nor does the information they rely on reasonably support the specific allegations of fraud against Cole. On the parties' respective showings, we conclude that Cole has made the requisite prima facie showing that the fraud and fraud-related causes of action against him in *Bains* were not supported by probable cause.

### B. *Malice*

■ The malice element of malicious prosecution goes to the defendants' subjective intent for instituting the prior case. (*Soukup, supra,* 39 Cal.4th at p. 292.) Malice does not require that the defendants harbor actual ill will toward the plaintiff in the malicious prosecution case, and liability attaches to

---

[6] Code of Civil Procedure section 128.7, subdivision (b)(3) requires that allegations lacking evidentiary support be "specifically so identified" if the pleader reasonably believes that such support would be developed through additional investigation or discovery. (See generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶¶ 9:1169 to 9:1171, p. 9(III)-20 (rev. # 1, 2007).) Although the Meyer defendants urge us not to discount the difficulties they encountered in developing evidentiary support for their claims from key witnesses who exercised their privilege against self-incrimination, the amended versions of the *Bains* complaint did not specifically identify the factual allegations for which support was reasonably expected to develop through additional discovery. Rather, the vast majority of the allegations against Cole were pled as ultimate facts for which, presumably, support already existed.

attitudes that range " 'from open hostility to indifference. [Citations.]' " (*Ibid.*) Malice may be inferred from circumstantial evidence, such as the defendants' lack of probable cause, supplemented with proof that the prior case was instituted largely for an improper purpose. (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 225 [105 Cal.Rptr.3d 683] (*Daniels*).) This additional proof may consist of evidence that the prior case was knowingly brought without probable cause or was brought to force a settlement unrelated to its merits. (*Id.* at pp. 226, 228.) A defendant attorney's investigation and research also may be relevant to whether the attorney acted with malice. (*Sheldon Appel, supra*, 47 Cal.3d at p. 883.)

Cole argues that there was no evidence supporting the many specific allegations of fraud against him in *Bains*. As we have discussed, the allegations for the most part consisted of inferences from circumstantial evidence couched as statements of ultimate fact. Among the more serious were allegations that Cole was actively involved in the day-to-day operations of Peregrine, worked closely with the company's CEO to establish its business model, attended operational meetings, and was instrumental in establishing sales and revenue forecasts. The *Bains* complaint also alleged that Cole destroyed evidence.

Cole points to the considerable information developed during the internal investigation at Peregrine, the 200 boxes of documents produced to governmental authorities that were made available to the plaintiffs in the *Litigation Trust* case, the depositions taken in the Peregrine bankruptcy case and in other civil cases (including his own depositions), his responses to discovery in *Bains*, and the guilty plea agreements by four of the eight indicted Peregrine employees. He notes that the Latham report concluded there was no evidence the outside directors were involved in Peregrine's daily operations or knew of management's fraudulent practices.

In opposition, the Meyer defendants rely on *Daniels, supra*, 182 Cal.App.4th at page 227, to argue that an attorney's "sustained inability to provide any support for [a client's] allegations, on its own, does not allow an inference that [the attorney] knew there was no probable cause for continuing to prosecute the underlying action." The complaint in *Daniels* alleged that the defendant in that case had slandered the plaintiff by telling various individuals he had kidnapped her son and forced him into a sexual relationship. (*Id.* at p. 211.) After the plaintiff repeatedly refused to be deposed and answer discovery requests, the trial court dismissed the slander case as a discovery sanction. (*Ibid.*) The appellate court assumed that the plaintiff must have told his attorneys something about the alleged slanderous statements. (*Id.* at p. 223.) The attorneys were entitled to believe his version of events or to believe that they would obtain admissible evidence from other witnesses who

heard the statements. (*Id.* at p. 224.) The court concluded that the attorneys' failure to conduct a factual investigation and develop evidentiary support for the client's allegations was insufficient to establish that they knew the slander claim lacked probable cause. (*Id.* at pp. 226–227.)

The holding in *Daniels* was premised on the assumption that the slander claim was based on the plaintiff's allegations, which the attorneys were entitled to believe. In contrast, the Meyer defendants have offered no evidence that the allegations in *Bains* represented what their clients told them. In fact, the shareholders in *Bains* were in no better position than their attorneys to know the details of the fraudulent scheme at Peregrine. The Meyer defendants provide very little evidence beyond the conclusory averment that they relied on information developed through investigation and discovery and drew reasonable inferences from it. Although Meyer claims to have developed "a considerable body of proof in support of the claims . . . advanced in *Bains*, including various percipient and expert declarations," the only actual declarations she points to are the two declarations about Cole's management of Peregrine in the 1980's.

The Meyer defendants argue that there is no evidence they had the Latham report or Cole bankruptcy deposition before filing *Bains*. Alternatively, they cite the Latham report's disclaimer that it did not make ultimate determinations of individual liability, and its comment that board meeting minutes were "cryptic." But these disclaimers do not support an inference that Cole participated in the fraud that harmed Peregrine investors or in any destruction of evidence. Additionally, Meyer's heavy reliance on the *Litigation Trust* case supports the inference that Cole was named in *Bains* by analogy to that case but without regard for the difference in the legal theories advanced in each case.

In short, the Meyer defendants have not rebutted Cole's showing that they alleged the fraud and fraud-related claims against him without direct or circumstantial evidence to support them. This, coupled with the dearth of evidence about their actual investigation and their apparent tendency to exaggerate, is sufficient to overcome their anti-SLAPP motion as to Cole's malicious prosecution claims.

### C. *Liability of the Boucher Defendants and Ottilie*

Cole argues the Boucher defendants and Ottilie should not avoid liability for malicious prosecution on the ground that they did no actual work on *Bains* despite being identified as counsel of record throughout the case. On the parties' respective showings, we cannot conclude as a matter of law that these attorneys may avoid liability for malicious prosecution by learning

nothing or close to nothing about the *Bains* case, throughout which they allowed themselves to be consistently identified as counsel of record for the plaintiffs.

Ottilie and the Boucher defendants were identified in the pleadings in *Bains* as "[a]ttorneys for [p]laintiffs" along with the Meyer defendants. They apparently were listed as counsel for the plaintiffs on all filings in *Bains*, including the appellate briefs filed after the summary judgment. (*Bains, supra,* 172 Cal.App.4th at p. 448.) According to Cole's attorney, defense filings in *Bains* were served on all counsel of record. There is no evidence that Ottilie and the Boucher defendants objected to service or notified the court or opposing counsel that they did not actually represent the *Bains* plaintiffs.

In support of the anti-SLAPP motion, Boucher declared that his law firm had a working relationship with the Meyer defendants, in which one firm initiated and developed a case and the other firm tried it. A similar relationship existed in *Bains*, where the Meyer defendants undertook all pretrial work and the role of the Boucher firm was limited to participating at trial, should there be a trial. According to the declaration, the Boucher defendants did not sign, draft, prepare, review, serve, approve, or discuss the contents of any pleading in *Bains* or participate in the case in any way. Boucher's declaration did not indicate whether he or his law firm knew anything about the *Bains* case.

Ottilie declared that he discussed the case with Aguirre and saw a drafted complaint. He relied on Aguirre's assessment of probable cause against Cole since Aguirre was the expert securities litigator, and Ottilie's role was limited to assisting with trial. He was not involved in "determining whether probable cause existed to sue" Cole or in any decision made in *Bains*. He billed no attorney time on the case.

The Boucher defendants argue that "their duty to make an independent probable cause determination never arose because their specific role in the action was never triggered." Ottilie argues that, because he was not a securities expert, he "had no ability to see through the esoteric securities concepts and theories" alleged in *Bains* to determine whether those against Cole had merit.

██ As counsel of record, the Boucher defendants and Ottilie had a duty of care to their clients that encompassed "both a knowledge of [the] law and an obligation of diligent research and informed judgment." (*Wright v. Williams* (1975) 47 Cal.App.3d 802, 809 [121 Cal.Rptr. 194].) They contend they relied in good faith on the Meyer defendants' investigation of the claims in *Bains*, insisting that this reliance was reasonable because of their prior

business relationships with Aguirre and Meyer and the Meyer defendants' competence and expertise. They cite California Rules of Professional Conduct, rule 3-110(C), which allows an attorney who lacks sufficient learning and skill necessary to provide competent representation to associate with or consult another lawyer reasonably believed to be competent. But even when work on a case is performed by an experienced attorney, competent representation still requires knowing enough about the subject matter to be able to judge the quality of the attorney's work. (See Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2011) ¶ 6:76, p. 6-18 (rev. # 1, 2011).) From their declarations, it can be inferred that the Boucher defendants knew nothing about the merits of the *Bains* case and that Ottilie, despite his discussions with Aguirre, did not understand the theories asserted in the case sufficiently to be able to judge their merit.

California law generally allows an attorney of record to associate with another attorney and to divide the duties of conducting the case. (*Wells Fargo & Co. v. City etc. of S. F.* (1944) 25 Cal.2d 37, 42 [152 P.2d 625]; see *Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441, 445–446 [98 Cal.Rptr.2d 193].) This does not mean, however, that an associated attorney whose name appears on all filings in a case and who is served with all documents filed by the other side need not know anything about the case with which he or she is associated. Nor should an associated attorney whose name appears on all filings be able to avoid liability by intentionally failing to learn anything about a case that may turn out to have been maliciously prosecuted in whole or in part.

Aside from the duty to the client, an attorney has a responsibility to avoid frivolous or vexatious litigation. (See Code Civ. Proc., § 128.7, subd. (b) [attorney who "present[s]" pleading, motion or similar paper to court impliedly certifies its legal and factual merit].) In *In re Girardi* (9th Cir. 2010) 611 F.3d 1027, in the context of imposing sanctions under 28 United States Code section 1927 for recklessly or intentionally misleading the court through frivolous filings, a special master appointed by the Ninth Circuit explained that the "willful ignorance" of the plaintiffs' cocounsel of record in the underlying case was not a defense. (*Girardi*, at pp. 1061–1062, citing *In re Mitchell* (3d Cir. 1990) 901 F.2d 1179, 1188 [division of labor among counsel does not diminish attorney's personal responsibility for complying with court rules].) The special master recommended that the attorney be sanctioned despite his claim to have been unaware of the false positions propagated in briefs to which his signature was affixed by another counsel of record. (*Id.* at p. 1062 & fn. 47.) Based on the special master's recommendations, the attorney and his law firm were held liable for a portion of the attorney fees and costs incurred by the defendants in the underlying case. (*Id.* at p. 1067.)

 While the filings in *Bains* were not personally signed by Ottilie or anyone at Boucher's law firm, the Boucher defendants and Ottilie lent their names to all filings in that case, supporting an inference that they "presented" these filings to the court and thus initiated and prosecuted *Bains* along with the Meyer defendants. (See Code Civ. Proc., § 128.7, subd. (b) ["presenting" pleadings, motions, and other similar papers to court includes "signing, filing, submitting . . ." these papers].) The Boucher defendants and Ottilie cannot avoid liability for malicious prosecution by claiming to have been ignorant of the merits of the allegations made against Cole in *Bains*.

The Boucher defendants argue that there is no authority for holding them liable for maliciously initiating or prosecuting the case against Cole just because their names appeared on filings in *Bains* because they did not actively participate in the case. Cole relies on *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385 [69 Cal.Rptr.3d 561] (*Sycamore Ridge*). *Sycamore Ridge* was a malicious prosecution case brought by a landlord against the attorneys who represented a tenant in a prior case. The prior case was brought on behalf of 45 tenants and alleged 18 causes of action based on poor living conditions and unfair business practices. (*Id.* at pp. 1392–1393.) One tenant's response to interrogatories indicated that she suffered no personal injury or property damage. (*Id.* at p. 1403.) In a two-to-one decision, the *Sycamore Ridge* court denied an anti-SLAPP motion filed by the LaFave attorney defendants, who had entered the prior case as cocounsel a month before the tenant's claims were dismissed at her request. (*Id.* at pp. 1394, 1410.)

The court reasoned that "[b]efore agreeing to become attorney of record in a pending case, an attorney should, at a minimum, be familiar with the client's claims and should have made a preliminary determination whether probable cause exists to support the asserted claims or defenses. By associating into the case as cocounsel, the LaFave defendants became the proponents of all of [the tenant's] claims, which included a large number of claims that were untenable on their face." (*Sycamore Ridge, supra*, 157 Cal.App.4th at p. 1407.) The court reasoned further that "[m]aintaining a case one knows, or should know, is untenable continues to harm the defendant as long as the case remains open, since the defendant must continue to prepare a defense to the case as long as the case appears to be moving forward. An attorney who associates into a case that is being maliciously prosecuted participates in harming the defendant for the time period that the attorney allows the untenable claims to remain alive." (*Id.* at p. 1410.) The court rejected the LaFave defendants' claims that their role was limited to one part of the case, " 'the mold exposure aspect of the litigation' "; that they were not involved in selecting the plaintiffs or causes of action; and that they believed the lawsuit against the landlord was supported by probable cause. (*Ibid.*)

The Boucher defendants and Ottilie argue that *Sycamore Ridge* is distinguishable and should be limited to its facts. But their arguments are not substantively different from those made by the LaFave defendants, and the evidence presented in relation to the anti-SLAPP motions does not require us to expand the holding of *Sycamore Ridge*.

The LaFave defendants did nothing beyond associating as counsel. (*Sycamore Ridge, supra*, 157 Cal.App.4th at p. 1396.) Their contemplated role. was limited to the mold exposure aspect of the case and apparently was not triggered in the month after they associated into the case and before the tenants' claims were dismissed. (*Id.* at pp. 1396, 1410.) Thus, *Sycamore Ridge* provides authority for holding an attorney liable for the very act of associating into a case containing frivolous claims.

The LaFave defendants were associated as experts in a particular area of law, mold exposure liability. (*Sycamore Ridge, supra*, 157 Cal.App.4th at p. 1410.) The Boucher defendants and Ottilie claim to have been associated as trial counsel in *Bains*, and thus presumably would have had to be proficient in all aspects of the case in order to try it, had the case gone to trial. Also, unlike the LaFave defendants, whose association into a partially frivolous case was for a brief one month before the unmeritorious claims were dismissed (*id.* at pp. 1394, 1410), the Boucher defendants and Ottilie were associated with the *Bains* case for years. The circumstances of the Boucher defendants and Ottilie's association in this case appear to be more egregious than those of the LaFave defendants in *Sycamore Ridge*.

No explanation has been offered as to why the Boucher defendants and Ottilie needed to associate in *Bains* from the very beginning, why they allowed their names to appear as counsel for the plaintiffs on filings in *Bains* over several years, or why they did not advise the court and opposing counsel of their limited involvement in the case. The Boucher defendants argue that there is no evidence they associated with the case for an improper purpose, such as to "show more power." But their premature association supports that inference.

It also undercuts the public policy argument that attorneys should not be required to create a record of diligence before their role as cocounsel is triggered. Attorneys may easily avoid liability for malicious prosecution without having to engage in premature work on a case if they refrain from formally associating in it until their role is triggered. Attorneys may also avoid liability if they refrain from lending their names to pleadings or motions about which they know next to nothing.

Although they argue that their relationship with the Meyer defendants justified their association in the case, the Boucher defendants and Ottilie have

not shown they had any knowledge of the claims asserted against Cole in *Bains* or made any effort to independently investigate and research the validity of these claims. The failure to make such a showing supports the conclusion that they lent their names to the case with indifference to its actual merit. Cole has thus made the minimum showing required to survive the Boucher defendants' and Ottilie's anti-SLAPP motions.[7]

## III

Cole's defamation claim is based on the publication of the fourth amended complaint on the Internet. The evidence he provided in support of his opposition to the anti-SLAPP motions established that, as late as August 2009, the complaint could be accessed through a hyperlink under "Recent Cases" on the Meyer & Associates Web site.

Initially, Cole disputes that the online publication of the complaint is an activity protected by the anti-SLAPP statute. The Meyer defendants argue without any analysis that it is protected by Code of Civil Procedure section 425.16, subdivision (e)(1) as a "writing made before a . . . judicial proceeding," and by subdivision (e)(2) as a "writing made in connection with an issue under consideration or review by a . . . judicial body." They fail to distinguish the filing of the complaint in the *Bains* case from its republication on the Internet.

■ The litigation privilege in Civil Code section 47, subdivision (b) had been used to determine whether a statement is protected by Code of Civil Procedure section 425.16, subdivision (e)(1) and (2). (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323 [46 Cal.Rptr.3d 606, 139 P.3d 2].) It does not apply to republications of privileged statements to nonparticipants in the action. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365].) The scope of Code of Civil Procedure section 425.16, subdivision (e)(2) is somewhat broader. (See *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1055 [61 Cal.Rptr.3d 434] [e-mail litigation update protected].) Here, the record does not establish exactly when the complaint was uploaded on the law firm's Web site. By August 2009 the *Bains* case was no longer pending in any court since the Supreme Court had denied the plaintiffs' petition for review in July 2009. The Meyer defendants have not shown that the complaint was published on the Internet before a judicial proceeding or in connection with an issue under consideration by a judicial body.

---

[7] Because we hold that Cole has made a prima facie showing of probability of prevailing on his malicious prosecution claims against the Boucher defendants and Ottilie, we do not reach his argument that the trial court abused its discretion in not allowing him to conduct discovery into these defendants' participation in *Bains*.

 The Meyer defendants alternatively assert that publishing the complaint on the Internet is protected by Code of Civil Procedure section 425.16, subdivision (e)(3) and (4) as a statement "made in . . . a public forum in connection with an issue of public interest" or made "in connection with a public issue or an issue of public interest." An Internet Web site that is accessible to the general public is a public forum.[8] (*Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 950 [59 Cal.Rptr.3d 48].) Whether posting the complaint on the law firm's Web site was in connection with an issue of public interest presents a closer question.

The Meyer defendants rely on cases holding that corporate activity is an issue of public interest if the company is publicly traded, has many investors, and has promoted itself through press releases. (See *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576 [27 Cal.Rptr.3d 863] [postings on message board spurred by company's press release]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010–1011 [113 Cal.Rptr.2d 625] [posting of complaint filed with Securities and Exchange Commission about possible securities law violations].) These cases involve postings about existing companies, whose financial health and management are a concern to the investing public.

In contrast, the *Bains* complaint contained allegations of corporate fraud at a defunct company. It is unclear from the record whether the fraud at Peregrine was still an issue of widespread public interest at the time the complaint was posted on the firm's Web site. Nor have the Meyer defendants shown that the complaint contributed to the debate as opposed to reporting "some earlier conduct or proceeding." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 899 [17 Cal.Rptr.3d 497].) We are therefore inclined to agree with Cole that the Meyer defendants have not met their burden of proof on the threshold issue whether the anti-SLAPP statute applied to the defamation claim. (See *Jarrow, supra,* 31 Cal.4th at p. 733.)

Even assuming that the burden shifted to Cole to show a likelihood of prevailing on the merits, the only challenge to the defamation claim in the trial court was that the complaint was absolutely privileged under Civil Code section 47, subdivision (b). As we have explained, the litigation privilege does not apply to the republication of privileged statements to nonparticipants in the action. (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 219.) Republications may be protected by other privileges, such as the fair reporting privilege under Civil Code section 47, subdivision (d)(1), which protects "a fair and

---

[8] The single publication rule applies to Internet publication regardless of how many people actually see it. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 395, 399 [13 Cal.Rptr.3d 353].) Under that rule, publication occurs when the allegedly defamatory statement is first made available to the public. (*Id.* at p. 401.)

true report in, or a communication to, a public journal, of (A) a judicial . . . proceeding." But the Meyer defendants have not identified any privilege that would apply to posting the complaint on the law firm's Web site.

For the first time on appeal, the Meyer defendants argue that Cole is a limited purpose public figure and that he cannot show by clear and convincing evidence that the allegations in the complaint were made with malice. They claim that the facts needed to decide these issues are in the record. We disagree.

In *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 265 [79 Cal.Rptr.2d 178, 965 P.2d 696], the court explained that "assuming a person may ever be accurately characterized as an *involuntary* public figure," this characterization is reserved "for an individual who, despite never having *voluntarily* engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements." There is no evidence in the record about Cole's prominence in the controversy surrounding Peregrine's collapse or his media access as a result. The Meyer defendants propose that he became a limited purpose public figure by virtue of his position at the company and the ensuing lawsuits and investigations. They present no authority for the proposition that legal actions by themselves may turn an individual into a limited purpose public figure. The authority appears to be to the contrary. (See *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254 [208 Cal.Rptr. 137, 690 P.2d 610] ["a person or group should not be considered a 'public figure' solely because that person or group is a criminal defendant [citation]; has sought certain relief through the courts [citation]; or merely happens to be involved in a controversy that is newsworthy [citation]"].)

We conclude that the Meyer defendants' anti-SLAPP motion did not adequately challenge the defamation claim against Meyer and Meyer & Associates.

## IV

The trial court struck Cole's defamation claim against all defendants except Meyer and Meyer & Associates. Cole's opening brief on appeal did not raise any issue with regard to this ruling, and in response to the cross-appeal, he argued that the ruling must be affirmed. From this, we conclude that he has

not challenged the striking of the defamation claim as to Aguirre, Ottilie and the Boucher defendants. Our conclusions about the defamation claim against Meyer and Meyer & Associates do not affect the trial court's ruling as to the other defendants.

■ A defendant prevailing on a special motion to strike is entitled to recover his or her attorney fees and costs for the motion. (Code Civ. Proc., § 425.16, subd. (c)(1).) Where the motion is partially successful, the question is whether the results obtained are insignificant and of no practical benefit to the moving party. (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1177 [131 Cal.Rptr.3d 478].) A court awarding fees and costs for a partially successful anti-SLAPP motion must exercise its discretion in determining their amount in light of the moving party's relative success in achieving his or her litigation objectives. (*Ibid.*)

The trial court granted the Boucher defendants' and Ottilie's anti-SLAPP motions in full and awarded attorney fees and costs for the motions without allocating the awards between the defamation and the malicious prosecution claims. Because we partially reverse the order granting these defendants' anti-SLAPP motions with regard to the malicious prosecution claims against them, the award of attorney fees and costs to Ottilie in the September 9, 2010 order and to the Boucher defendants in the November 15, 2010[9] order also must be reversed. On remand, the trial court must exercise its discretion in determining the appropriate amount of fees and costs, if any, to which these defendants are entitled.

## DISPOSITION

The September 9, 2010 order granting the special motions to strike is reversed as to the malicious prosecution claims against the Boucher defendants and Ottilie and as to the award of attorney fees and costs to Ottilie. In all other respects the order is affirmed. The November 15, 2010 order is reversed to the extent it awarded attorney fees and costs to the Boucher defendants. It is affirmed in all other respects. The case is remanded to the trial court with directions to determine whether the Boucher defendants and Ottilie are

---

[9] The entry date of an appealable order is the date it is entered in the minutes unless the minute order directs that a written order be prepared. (Cal. Rules of Court, rule 8.104(c)(2).) The November 15, 2010 minute order did not direct the preparation of a written order, even though written orders were later filed. On appeal from the minute order, Cole challenges only the award of fees and costs to the Boucher defendants and not the contemporaneous award of fees and costs to Aguirre. Thus, the November 15, 2010 minute order is reversed only in part. The partial reversal necessarily affects also the November 22, 2010 written order confirming the award of fees and costs to the Boucher defendants.

entitled to an award of attorney fees and costs for their partially successful anti-SLAPP motions and the reasonable amount of such an award. The trial court is to conduct further proceedings consistent with this decision.

Cole is entitled to recover his costs on appeal.

Willhite, J., and Manella, J., concurred.

A petition for a rehearing was denied June 26, 2012, and the petitions of defendants and respondents for review by the Supreme Court were denied August 29, 2012, S203895. Werdegar, J., did not participate therein.