Filed 5/30/14  Fridman v. Denison CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| GIDEON FRIDMAN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>GLORIA DENISON et al.,<br><br>    Defendants and Respondents. | G047864<br><br>(Super. Ct. No. 30-2012-00562011)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Sheila Fell, Judge.  Affirmed.

Law Office of Glenn E. Stern, Glenn E. Stern, Jan T. Aune and Richard Coberly for Plaintiff and Appellant.

Law Offices of Cleidin Z. Atanous and Cleidin Z. Atanous for Defendant and Respondent Gloria Denison.

Law Offices of Robert A. Walker, Robert A. Walker and Michelle N. Vo for Defendants and Respondents Sara Colamonico and Carlo Colamonico.

\*          \*          \*

This is an appeal from an order granting defense motions pursuant to Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute,[2] in an action for defamation, malicious prosecution, and intentional infliction of emotional distress. The underlying dispute relates to a neighborhood quarrel in the City of Fullerton (the City). On one side is the plaintiff, Gideon Fridman. He is the trustee of the estate of Nieves Lemanski's husband. On the other are the defendants, Gloria Denison and Sara and Carlo Colamonico (collectively the defendants, although we refer to "the Colamonicos" jointly or as Sara and Carlo where it is necessary to distinguish them). The defendants are Lemanski's neighbors.

Fridman's complaint alleges the defendants defamed him to each other and the City by falsely reporting that he was conducting a business from Lemanski's residence, engaged in malicious prosecution by reporting the alleged business and purportedly abusing Lemanski, and these same activities constituted intentional infliction of emotional distress. The defendants filed the instant anti-SLAPP motions, with Denison also filing a demurrer to the intentional infliction of emotional distress cause of action.[3] The court granted the motions and sustained the demurrer. The court subsequently denied Fridman's motion to reconsider. We agree with the defendants that the motions were properly granted, and the motion to reconsider properly denied, and we therefore affirm.

---

[1] Unless otherwise indicated, subsequent statutory references are to the Code of Civil Procedure.

[2] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[3] Fridman offers no argument that the demurrer should not have been sustained, any argument on this point is therefore waived. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865.)

# FACTS

In April 2012, Fridman filed the instant case against the defendants, and on June 14, he filed the first amended complaint (the complaint). The complaint alleged that in June 2006, Fridman became "the trustee for Nieves Lemanski." At the time, Denison had medical power of attorney for her. She was a neighbor who lived close by. The Colamonicos were also neighbors. Although Fridman lived in Woodland Hills, he had worked in the City for more than 30 years and had a good reputation.

According to the complaint, around October 2009, the defendants discussed among themselves that there were too many deliveries to Lemanski's home, and therefore, Fridman must be running a business of some kind. These allegations were eventually reported to the City. Around the same time, they discussed that Lemanski had missed medication dosages, and that Fridman was responsible for elder abuse. The complaint alleged these statements were not privileged and made with knowledge of their falsity and no reasonable grounds to believe they were true.

In response to the complaint to the City, police and paramedics performed a welfare check on Lemanski in October 28, 2009. Lemanski was "taken from the home against her will for observation regarding her blood pressure . . . ." Fridman alleged that he was investigated for elder abuse. Shortly thereafter, Fridman and Lemanski were questioned by police detectives regarding the purported abuse, and a City employee inquired about the home business.

The complaint alleged that the statements regarding the conduct of a business were defamatory because "they imputed criminal activity." Fridman further alleged that as a result of the investigation by the City, he filed a lawsuit against the City

which resulted in a "stroke related to the stress of" that case.[4]  He also alleged general damages to his reputation, the cost of a private investigator to determine who had made the allegations, and the cost of legal counsel.  The same basic facts were alleged with respect to Fridman's causes of action for malicious prosecution and intentional infliction of emotional distress.  Fridman claimed he was entitled to punitive damages due to the defendants' malice, oppression and fraud.

On August 10, 2012, the Colamonicos filed an anti-SLAPP motion, arguing their actions of reporting the alleged business to the City and requesting a welfare check were protected and privileged.  In her supporting declaration, Sara testified that her home was situated in a way where utilities are accessed through backyard easements.  One evening, she saw an AT&T technician in her backyard and asked what he was doing.  He said he was installing a "business line in the garage at the corner house," which belonged to Lemanski.  She also saw the technician enter the garage several times.  On another day, her husband told her that he saw a worker from the power company, who said he was installing a "220-line for commercial motors" in the same garage.  On another day, she saw "casting equipment" being moved from a van to the inside of the garage.  She knew that such equipment could be hazardous and dangerous.  On many other occasions, she saw UPS trucks making deliveries.  She asked Lemanski about these activities, but she said she did not know about them, and was "locked out of her garage."  Sara was concerned because Lemanski seemed confused about the activities at her house.  She then decided to call the City to report that a business was possibly being conducted and to request a welfare check.  Carlo's declaration was similar, and he further stated that Lemanski had told him that "Gideon Fridman does not allow her to go into her garage."

---

[4] In 2012, this case apparently settled.  There is no indication of any admission of liability on the City's part, nor is the amount of the settlement set forth in the document Fridman references. According to Fridman, the settlement means he "was cleared of any charges."

4

Denison also filed an anti-SLAPP motion, arguing the first and second causes of action should be stricken. Her declaration in support stated that she had been friends with Lemanski since 2006, and took her grocery shopping and on other errands. She was unaware he was her trustee until the events surrounding this case occurred. After Lemanski's husband died, Fridman started showing up once or twice a week. After a time, it became "very noticeable" deliveries were being made on a regular basis, "as well as people coming and going in lab coats." When Denison asked Lemanski about the people moving boxes into her garage, Lemanski said it was "making her nervous to have some many people she didn't know at her house." Lemanski thought Fridman was using the garage for storage, since he could no longer afford the building he had been renting. She also told Denison she was concerned about a phone line being installed in the garage, and she was unclear why it was needed if the garage was using for storage. Lemanski also said that Fridman was going to upgrade the electricity. At another point, Lemanski told her that there was going to be some "dental equipment coming from [Fridman's] lab. He could no longer afford the rent so he was going to use her garage."

Denison further stated she had not initiated contact with the City. She had spoken to the City worker twice, once when she knocked on her door to ask if she knew whether Lemanski was home. She then told Lemanski that people from the City wanted to talk to her, and Lemanski replied that they wanted to inspect her garage and she did not know what to do because Fridman was not there and had put a lock on the garage. She said she would not answer the door until Fridman came again and he could deal with the City.

The second time Denison had contact with the City was when the worker also called her on the date of the welfare check to ask if any emergency personnel were at Lemanski's home, because Fridman had called the worker and stated the investigation had caused her to have a heart attack. The City worker then sent paramedics to the home

5

based on Fridman's statement. Denison went to Lemanski's home and saw the paramedics taking vitals, but according to the paramedics, she was not having any chest pains and had not had a heart attack. She had no idea that Lemanski was behind on her medication until that day, when she retrieved the medications for the paramedics. She overheard the police question Fridman, who referred to himself as Lemanski's "care giver" but said he just picked up the medications, he did not make sure she took them. Because the paramedics were concerned that Lemanski was not taking her medication, they suggested taking her to the hospital for observation because her blood pressure was a little high. Lemanski stated she did not want to go, and the paramedics advised her to see her doctor. Just before they left, she was feeling dizzy and said she would go to the hospital. She went of her own free will. Fridman was not in the room during this conversation. Denison reiterated that this was the first time she had learned that Lemanski was behind on her medication, and therefore, Denison had never said this to anyone or reported it to the City.

The day after Lemanski was admitted to the hospital, Denison and Sara visited her. She seemed content and "happy about all the attention she was getting." She never said anything about being there against her will. During this visit, Lemanski signed a new advance directive and gave Denison health care power of attorney. Sara told Denison and Lemanski that it was she who had contacted the City to ask about zoning laws and business permits. Their home had recently been burglarized and she was concerned about the extra activity. Lemanski said she understood the concern and did not show she was upset.

Denison also filed a demurrer to the third cause of action for intentional infliction of emotional distress, arguing that Fridman had failed to allege outrageous conduct as a matter of law.

In his opposition to the Colamonicos' motion, Fridman argued that their statements to the City were not privileged and the anti-SLAPP statute did not apply because the topic was not one of widespread public interest. With respect to the defamation claim, he asserted that establishing that the defendants had discussed among themselves their allegation that he was running a business and had abused Lemanski were sufficient because his settlement with the City established those allegations were false. With respect to malicious prosecution, he argued it was sufficient that he had alleged a lack of probable cause, with malice thereby implied. On his claim for intentional infliction of emotional distress, Fridman argued that it was sufficient he could prove statements were made about him without probable cause, resulting in damages.

His opposition to Denison's motion made similar arguments. With respect to Denison's demurrer, he argued that he had sufficiently alleged "baseless and reckless" behavior that resulted in severe emotional distress.

Fridman's evidence in support of his opposition to the motions consisted of nearly identical declarations, portions of the deposition of the City worker who had taken the defendants' complaints, and the report from the investigating detective, which ultimately concluded that "[a] crime could not be established."

In his declaration, Fridman said that he and Denison had never gotten along. He had asked for her key to Lemanski's house to be returned. He stated he had seen Denison talk to the Colamonicos, and "then get quiet as I was around." He said he was "surprised" that anyone would make such false allegations against him.

The City worker's deposition contradicted Denison's declaration in some respects. The worker stated she had Denison's telephone number because Denison had called her previously. During that conversation, Denison said that Fridman had asked her to stay away from Lemanski and had demanded the return of a house key. Denison had told the worker that Lemanski might be "scared or intimidated." There was no mention

7

that Denison had disparaged Fridman in any way, or accused him of running a business or of elder abuse. The worker testified consistently with Denison about the events of October 28, the day of the welfare check. It was the worker who initiated the welfare check based on Fridman's statement that Lemanski had suffered a heart attack.

The defendants filed replies without additional evidence. After argument, on October 17, 2012, the court granted the Colamonicos' motion to strike the complaint. The court also granted Denison's motion to strike the first two causes of action and sustained the demurrer to the third cause of action. The court found that the anti-SLAPP statute applied, and Fridman had not presented evidence that demonstrated minimal merit as to his claims. With respect to the demurrer, the court found that reporting a neighbor's suspicious behavior to the police was not extreme conduct as a matter of law.

On October 29, Fridman filed motions to reconsider. According to Fridman, he spoke to Lemanski, who had previously not wanted to be involved in the case. Lemanski "had a change of heart" after the court's ruling. He offered declarations by Lemanski which he argued supported his claims. He argued these constituted "new facts" and therefore justified reconsideration. The defendants, unsurprisingly, opposed, arguing that his claim of "new facts" was not supported by a valid reason why those alleged facts could not have been discovered earlier.

The court denied the motion, concluding that the "new facts" were not "new" within the meaning of the statute. Further, even if they were, they were insufficient to establish malice on the part of the defendants. Fridman now appeals.

II

DISCUSSION

A. *Motion for Reconsideration*

We address this issue first because it directly impacts the evidence that we consider in connection with the anti-SLAPP motions. A party affected by an order may

8

move for reconsideration "based upon new or different facts, circumstances, or law." (§ 1008, subd. (a).) To be entitled to reconsideration, a party must (a) show evidence of new or different facts and (b) provide a satisfactory explanation for failing to produce this evidence at an earlier time. (*Kalivas v. Barry Controls Corp.* (1996) 49 Cal.App.4th 1152, 1160-1161.)

A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard. (*Robbins v. Los Angeles Unified School Dist.* (1992) 3 Cal.App.4th 313, 319.) The trial court's "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

The relevant "new facts" at issue were the information in Lemanski's declaration, offered to the court for the first time in connection with Fridman's motion for reconsideration. Fridman's explanation for his failure to produce Lemanski's declaration earlier is that he "respected the wishes of his friend who is an elderly woman . . . with a heart condition." He asserts that "previous attempts to discover these facts had been unsuccessful."

In his reply brief, for the first time and without reference to evidence, he states: "Lemanski had already refused to provide information in this case." He also asserts, again without a record reference, that "the declarations of Mr. Fridman and Mrs. Lemanski together demonstrate that Mrs. Leamanski was asked to provide information early in the case." Lemanski's declaration says no such thing; the only references to Lemanski's desire not to stay out of the disputes relate to the time they were developing.[5]

_____

[5] For example, Lemanski's declaration stated: "It was also kind of odd that a few days later [Denison] stated that she had done some research on Mr. Fridman. She believed him to be divorced and living with a friend in Van Nuys. I did not react because I do not want to be involved in people's disagreements." The declaration made two more similar statements, such as "I again tried to stay out of the conflict," and "I tried to avoid being involved[.]" Neither of those statements involved the instant case.

9

Her declaration does not say at any point that she was asked and refused to give testimony earlier, or anything close to such a statement. Fridman's declaration stated only that "out of respect for her wishes, *I have not asked her* for information regarding my case." (Italics added.) Fridman's willingness to play fast and loose with the facts here is disturbing.

In support of his argument that reconsideration based on "new facts" was required, Fridman claims this case has some factual similarity to *Hollister v. Benzl* (1999) 71 Cal.App.4th 582. In that case, however, the newly discovered information was in the hands of the opposing party and required a motion to compel to obtain it. (*Id.* at p. 585.) That is rather obviously distinguishable from the facts here, where Fridman knew or should have known that Lemanski had relevant information and chose not to attempt to obtain it, whatever his reasons.

In *Kollander Construction, Inc. v. Superior Court* (2002) 98 Cal.App.4th 304 (disapproved on other grounds by *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107, fn.5), the other case Fridman cites, the plaintiff moved to set aside a dismissal of certain defendants on the ground of mistake. (*Kollander Construction, Inc. v. Superior Court*, *supra*, 98 Cal.App.4th at p. 308.) During the hearing, after briefing was completed, the defendants asked for an opportunity to respond to one of plaintiff's declarations. The court granted the request and took the matter under submission. Defendants then submitted a 75-page response, and the court denied the motion. (*Id.* at p. 309.) The plaintiff's motion for reconsideration was granted based on the filing of the 75-page response, which raised new issues and to which the plaintiff had no opportunity to respond. (*Ibid.*) The Court of Appeal held this was proper. (*Id.* at p. 314.) *Kollander* has no resemblance to the instant case. This is not a situation where the defendants attempted to ambush Fridman with new information he had no chance to respond to; this is a situation where Fridman was well aware Lemanski was a potential witness.

10

Neither case Fridman cites is applicable here, and he offers no "satisfactory explanation" for failing to obtain Lemanski's declaration earlier within the meaning of section 1008. (*Kalivas v. Barry Controls Corp.*, *supra*, 49 Cal.App.4th at pp. 1160-1161.) Merely learning new facts,which is what Fridman describes, is not enough. A motion for reconsideration requires "a strong showing of diligence" that is not present here. (*Forrest v. Deptartment of Corporations* (2007) 150 Cal.App.4th 183, 202 (disapproved of on other grounds by *Shalant v. Girardi* (2011) 51 Cal.4th 1164, 1172, fn. 3.) As Fridman's own declaration admits, prior to the hearing on the anti-SLAPP motions, he had not "asked [Lemanski] for information regarding my case." Therefore, the trial court did not abuse its discretion by denying the motion for reconsideration, and accordingly, we disregard Fridman's references to the evidence included therein, which he relies on significantly throughout his briefs.

## B. The Anti-SLAPP Statutory Framework

The anti-SLAPP statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Section 425.16, subdivision (e), specifies the type of acts covered by the statute. An "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral

statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e).)

The purpose of the anti-SLAPP statute is to dismiss meritless lawsuits designed to chill the defendant's free speech rights at the earliest stage of the case.  (See *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2.)  The statute is to be "construed broadly."  (§ 425.16, subd. (a).)  Defamation and intentional infliction of emotional distress are among the "favored causes of action in SLAPP suits . . . ." (*Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1400, fn. 9.)

To determine whether an anti-SLAPP motion should be granted or denied, the trial court engages in a two-step process.  "'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute.  (§ 425.16, subd. (b)(1).)'  [Citation.]" (*Jarrow Formulas*, *Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.)

If that threshold is met, courts then look to the second step, determining whether the plaintiff has demonstrated a probability of prevailing on the merits.  To do so, the plaintiff must state and substantiate a legally sufficient claim (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122-1123), thereby demonstrating his case has at least minimal merit. (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105 (*Cole*).)  "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by

a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) Accordingly, Fridman "must produce evidence that would be admissible at trial. [Citation.]" (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

On appeal, we "review an order granting an anti-SLAPP motion de novo, applying the same two-step procedure as the trial court. [Citation.]" (*Cole*, *supra*, 206 Cal.App.4th at p. 1105.) In conducting our review, "[w]e consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.] However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

*C. Protected Activity*

We must first decide whether the challenged claims arise from acts in furtherance of the defendants' right of free speech or right of petition under one of the four categories set forth in section 425.16, subdivision (e). Fridman argues that the anti-SLAPP statute does not apply for several reasons.[6] First, because the statements were malicious. Second, the conversations were not part of any petitioning activity. Third, the

---

[6] He refers to this as the "privilege" of the anti-SLAPP statute's catch-all provision in section 425.16, subdivision (e). But it is not a privilege; it is merely a question of whether the statute applies.

defendants cannot establish that the "public interest was served" by the purportedly defamatory statements or the reports to the City.[7]

We can address one of these points quickly. First, Fridman's assertion that the statements were "malicious" is the tail wagging the dog. That is a conclusion, not an argument, and not evidence. Further, the case Fridman cites on this point is inapposite. It is a summary judgment case relating to the conditional common interest privilege under Civil Code section 47 subdivision (c). (*Noel v. River Hill Wilsons, Inc.* (2003) 113 Cal.App.4th 1363.) Whether the statements were malicious is pertinent to success on the merits, but it has nothing to do with whether the first prong of the anti-SLAPP statute is met.[8]

Second, with regard to whether the case arose from the defendants' petitioning activity, Fridman argues that no petitioning activity occurred. But his own complaint alleges otherwise — it asserts the defendants "discussed these allegations [relating to running a business and elder abuse] among themselves *prior to reporting these allegations to the* [*C*]*ity. . . .*" (Italics added.) "'"[T]he constitutional right to petition . . . includes the basic act of . . . seeking administrative action.'"'" [Citations.]" (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087.) Filing a complaint with a government agency qualifies as a "statement before an official proceeding" within

---

[7] A fourth argument was based entirely on matter in Lemanski's declaration, and we therefore disregard it.

[8] Fridman cites *Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, for the proposition that a falsified police report does not qualify for protection under the anti-SLAPP statute. What he neglects to mention is that the trial court in that case found "the record 'conclusively' established that [the defendants'] statements to the police were 'illegal activity' under Penal Code section 148.5, and as such, not a 'protected activity' within the meaning of the anti-SLAPP statute." (*Id.* at p. 701.) There was, obviously, no such finding here, nor under any circumstance would we be able to reach that conclusion in this case. For the same reason, *Flatley v. Mauro* (2006) 39 Cal.4th 299, 320, is also inapposite.

14

section 425.16, subdivision (e)(1). (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1009; see also *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 941-942 [report to police]; *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1186 [report to animal control].)

"In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity. [Citations.]" (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89.) To conclude the "arising from" prong is met, the action must actually allege the harm was caused by the protected acts. "[I]t is the *principal thrust or gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation] . . . ." (*Martinez v. Metabolife Internat. Inc.* (2003) 113 Cal.App.4th 181, 188.)

Here, the complaint alleged that the defendants' false reports to the City and the police constituted the tortious acts that caused him damage. It was not the defendants' alleged publication of defamatory comments to each other, but to third parties that purportedly caused Fridman's harm. Thus, the principal gravamen of the case is the defendants' allegedly false reports to the City caused his harm. Because these reports constituted protected acts of petitioning, the anti-SLAPP statute applies.

Further, because the petitioning activity falls under section 425.16, subdivision (e)(1), we need not consider further whether an issue of public interest was present. "When the defendant's alleged acts fall under the first two prongs of section 425.16, subdivision (e) (speech or petitioning before a legislative, executive, judicial, or other official proceeding, or statements made in connection with an issue under review or consideration by an official body), the defendant is not required to independently demonstrate that the matter is a 'public issue' within the statute's meaning. [Citation.]" (*Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 600.) Accordingly, we find the defendants have satisfied the first prong of the anti-

15

SLAPP statute. We therefore turn to the question of whether Fridman's claims can succeed on the merits.

D. *Success on the Merits*

    *1. Defamation*

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. [Citation.]" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.)

Fridman's first problem is that he has not established, by admissible evidence, the existence of defamatory statements. He states "the false allegations against Mr. Fridman were that he was running an illegal business and engaging in elder abuse. Both are criminal in nature." He provides no evidence that running a business from a garage is a criminal offense in the City. The only evidence in the record is the letter from the City worker, which states that running businesses from a home is legal except under certain conditions, and businesses must be licensed. The letter also states that failure to comply with an inspection requirement would result in an "administrative citation" and result in a fine. Fridman provides no authority stating that an "administrative citation" is equivalent to a criminal penalty. Simply put, there is no evidence in the record that the activity the defendants allegedly reported is a crime, and it was Fridman's burden to produce admissible evidence — or at least a legal citation — on this point. (*HMS Capital, Inc. v. Lawyers Title Co.*, *supra*, 118 Cal.App.4th at p. 212.)

With respect to the allegation the defendants reported Fridman for elder abuse, that, indeed, would be a crime. Fridman, however, has no evidence such an allegation was ever made to the City. Denison had no idea that Lemanski was behind on her medication until the night of the welfare check. Sara testified she only asked for the City to perform a welfare check; she did not admit any other accusation. Carlo never

16

contacted the City at all. The City worker testified that Denison had said that Lemanski might be "scared or intimidated," but she did not say by whom, and in any event, that is not equivalent to an accusation of a crime. The worker did not recall anybody, prior to the welfare check, using the words "elder abuse," and nowhere in her testimony does she attribute such a statement to any of the defendants. Indeed, the first person to raise Lemanski's health with the worker was Fridman, who said the worker had given her a heart attack. Fridman offered no admissible contradictory evidence. Thus, Fridman has not established the existence of defamatory statements, and this alone would be enough to doom his defamation claim.

The defendants, though, also argue that any statements, assuming the statements were defamatory, were privileged. As pertinent here, Civil Code section 47, subdivision (c)[9] provides a privileged publication is made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Malice cannot be inferred from the communication itself. (Civ. Code, § 48.)

We agree with the defendants that citizens are "interested" in reporting either the existence of an unlicensed business or an elder who might be subject to abuse to the City. Thus, Fridman must establish malice at the time the communication was published. (*Katz v. Rosen* (1975) 48 Cal.App.3d 1032, 1037.) The malice necessary to

---

[9] In his reply brief, Fridman argues that defendants did not argue this, among other issues, below, and they cannot therefore argue them now. It is true that generally, we do not consider arguments made for the first time in this court. But when the issue is purely a matter of law, we may consider it for the first time. (*Gonzalez v. County of Los Angeles* (2004) 122 Cal.App.4th 1124.) That is particularly true where, as here, our review is de novo and we consider the issues in full without reliance on the trial court's findings. Further, Fridman had an opportunity to respond.

17

defeat the qualified privilege under Civil Code section 47, subdivision (c) is "'hatred or ill will going beyond that which the occasion for the communication apparently justified. . . .'  [Citation.]"  (*Katz v. Rosen*, *supra*, 48 Cal.App.3d at p. 1037. )  Fridman has come nowhere close to establishing this with evidence.  There is simply no evidence of the hate or ill will necessary to vitiate the privilege.  The best he could come up with in his own declaration, with regards to Denison, was that "[h]er and I have never gotten along."  The City worker, when asked, said that Denison never used insulting language toward Fridman.  He offers nothing at all with regard to the Colamonicos.  Fridman simply has nothing on this key issue, and without it, he has no possibility of prevailing on his claim for defamation.

### 2. Malicious Prosecution

"To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]"  (*Soukup*, *supra*, 39 Cal.4th at p. 292.)  Even if we assume the existence of the first two requirements (which, frankly, is quite unlikely), for the same reason Fridman could not establish malice with respect to the qualified privilege of Civil Code section 47, subdivision (c), he cannot establish it here.

"The 'malice' element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action.  [Citation.]  The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose.  [Citation.]  The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive.  [Citation.]"  (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 494 (*Downey Venture*).)

Nearly all of the evidence Fridman relies upon to establish malice come from Lemanski's excluded declaration. The only fact that comes from other evidence is the statement that the City worker reported that all the defendants called her to "express their gratitude that Mr. Fridman was being investigated." What the worker's report actually said is somewhat different. "Neighbors Sara and Carlo [Colamonico] called to let me know that Mrs. Lemansk[i] was doing well and thank me for calling the police to check on Mrs. Lemansk[i.] [¶] Gloria Denison called to thank me and let me know that she is now the primary person on file for Mrs. Lemansk[i]'s medical care. Said she did not have a heart attack and they are keeping her in the [hospital] for observation[.]" Neither of these statements are evidence of malice.

Fridman next argues that the lack of probable cause was evidence of malice. But that alone is not sufficient. (*Downey Venture*, *supra*, 66 Cal.App.4th at p. 494.) "[T]hat evidence must include proof of either actual hostility or ill will on the part of the defendant or a subjective intent to deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant. [Citation.]" (*Id*. at pp. 498-499; see also *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 225.) While malice may be inferred from circumstantial evidence such as the lack of probable cause, such evidence must be "supplemented with proof that the prior case was instituted largely for an improper purpose." (*Cole*, *supra*, 206 Cal.App.4th at p. 1114.)

Moreover, we keep in mind that malicious prosecution is a "disfavored action." (*Leonardini v. Shell Oil Co*. (1989) 216 Cal.App.3d 547, 566.) "[T]he elements of [malicious prosecution] have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872.) We are therefore entirely disinclined to read out

19

the malice requirement from a malicious prosecution cause of action, as Fridman would have us do.

As we discussed above, Fridman has no such evidence here; taken separately or together, the evidence is entirely insufficient to establish malice on the defendants' behalf. He has simply come nowhere close, and therefore, he did not demonstrate a probability of success on his claim for malicious prosecution.

*3. Intentional Infliction of Emotional Distress*

Fridman next argues that he has presented sufficient evidence of a claim for intentional infliction of emotional distress to overcome an anti-SLAPP motion. The two-paragraph argument in his opening brief states the elements of such a cause of action, and then argues that he suffered emotional damage based on the defendants "bullying tactics," again supported only by Lemanski's declaration. He then asserts: "This is a classic case of Intentional Infliction of Emotional Distress."

Fridman is wrong. He has neither pleaded this cause of action properly nor offered any evidence to support it. "'[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259.) Fridman has actually failed to support this claim on each and every element, but we can dispense with this issue quickly by focusing on one: extreme and outrageous conduct. "'Conduct, to be "'outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.' [Citation.]" (*Ibid.*) Nothing alleged here comes anywhere close.

## III

## DISPOSITION

The anti-SLAPP's motion were properly granted. As prevailing defendants, Denison and the Colamonicos are entitled to attorney fees on appeal pursuant to section 425.16, subdivision (c)(1), in an amount to be decided by the trial court. They are also entitled to their costs.

MOORE, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

ARONSON, J.