Filed 11/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GINA LEDOR et al.,<br><br>    Defendants and Appellants. | A165224<br><br>(Alameda County Super. Ct. No. RG21097953) |

Plaintiff filed a lawsuit alleging that his ex-girlfriend and her friends, including defendant and appellant Gina Ledor, embarked upon a "vengeful smear campaign" to harass and defame him after his senior year of high school.

Pertinent to this appeal, in the summer of 2020, Gina Ledor sent emails to school officials at Dartmouth College, stating essentially that plaintiff had committed voter fraud to win an election for student body president at Berkeley High School (BHS) and providing links to what she represented to be articles and a podcast about the incident. She wrote that she was sharing the information so that Dartmouth would be "truly aware of whom you have admitted," and the BHS election incident was only one of many instances where plaintiff had shown a lack of empathy and character, but it "just happened to be the most well-

1

documented." Sometime after receiving these emails, Dartmouth revoked plaintiff's offer of admission. In addition to her emails to Dartmouth, Gina later sent Instagram messages to two of plaintiff's acquaintances, that, among other things, advised them to "avoid him" because "men like him grow up thinking it's okay to disrespect women and be violent."

Plaintiff asserted claims against Gina[1] for defamation, false light, invasion of privacy, civil harassment, civil stalking, and intentional infliction of emotional distress, and he asserted a claim for vicarious liability against Gina's parents. The Ledors filed a special motion to strike the complaint as a strategic lawsuit against public participation (Code Civ. Proc.[2], § 425.16), and the trial court denied the motion.

We conclude that the Ledors did not meet their burden of showing that Gina's statements in the Dartmouth emails involve protected activity under section 425.16, subdivision (e)(2) or (4), and we find no established error in the court's ruling as to the Instagram messages. We therefore affirm the trial court's order.

BACKGROUND

## I.   The Complaint

The complaint alleges that plaintiff and defendant Nishat Sheikh began a romantic relationship when plaintiff was a junior

---

[1] Because the Ledor defendants share a last name, we refer to Gina individually by her first name.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

2

in high school.[3]  Then, in the summer of 2020, Sheikh and her friends, Ayumi Namba and Gina, embarked upon a conspiracy to ruin plaintiff's life when he sought to end his relationship with Sheikh.  At that time, plaintiff had been accepted to Dartmouth, and Sheikh and her friends disseminated false and defamatory information about him to Dartmouth officials and incoming students, causing Dartmouth to rescind plaintiff's offer of admission.  The defamatory statements cast plaintiff in a false light, and defendants went to great lengths to humiliate him, assassinate his character, and falsely portray him as dangerous, violent, unethical, and lacking empathy.[4]

Plaintiff alleged that he was forced to maintain a relationship with Sheikh because he feared her consistent manipulation, threats of acts of defamation, cyberbullying, and cyberstalking.  After the summer of 2020, Sheikh, Gina, and Namba continued to abuse, blackmail, and slander plaintiff until

---

[3] Plaintiff filed a separate action seeking a domestic violence restraining order (DVRO) against Sheikh, but that action is not at issue here.

[4] Paragraph No. 24 of the complaint pleads that, "among other things," the false and misleading correspondence defendants sent to third parties in the summer of 2020 stated that plaintiff hit his father and his friend, and his father called the police; plaintiff's father was afraid of him; plaintiff's father moved out of their home because he feared being assaulted by plaintiff; plaintiff told his ex-girlfriend to kill herself; the sender of the communication feared for the safety of plaintiff's future classmates and for her physical safety if plaintiff were to know the sender's identity; plaintiff's ex-girlfriend feared for her physical safety if plaintiff were to know of the communication being sent; and these were just "a few examples" of plaintiff's "incredibly manipulative and abusive" nature.

3

he filed a lawsuit, including threatening to contact his employer and spread lies so he would be fired, monitoring his whereabouts online, lying to get him banned from dating websites, and sending defamatory messages about him to his friends and acquaintances. Sheikh also frequently demanded that plaintiff account for the time he spent away from her and often demanded his immediate response to her calls and emails upon threat of further harmful action. Sheikh, Namba, and Gina acted in concert as part of a common plan, and acted with malicious intent and premeditation in seeking to destroy plaintiff's educational career, earning potential, and reputation.

Plaintiff alleged causes of action for defamation per se, false light, invasion of privacy, civil harassment, civil stalking, and intentional infliction of emotional distress against Sheikh, Namba, and Gina. He sued Casey Ledor and Kobi Ledor on a theory of vicarious liability for Gina's willful misconduct as a minor.

## II. The Special Motion to Strike (Section 425.16)

The Ledors filed an anti-SLAPP motion (the motion). They maintained that, although plaintiff alleged broadly that Gina had conspired to ruin his life through dissemination of false and misleading communications, he had not identified specific defamatory statements by Gina or pleaded their substance. The Ledors contended, however, that plaintiff's lawsuit was based on two emails that Gina sent to Dartmouth in the summer of 2020 (the Dartmouth emails) wherein she disclosed that plaintiff had cheated in an election for student body president at BHS in 2019

4

by hacking into email accounts of hundreds of fellow students and voting for himself. The Ledors also stated in their motion, "To extent that plaintiff asserts causes of action against [the] Ledor defendants based on any other written or oral statements attributable to Gina Ledor, defendants reserve the right to demonstrate they too arise from acts in furtherance of First Amendment rights and are also subject to this Special Motion to Strike."

The Ledors argued that Gina's statements in the Dartmouth emails were protected under section 425.16, subdivision (e)(2) (section 425.16(e)(2)) as written statements "made concerning official proceedings authorized by law — to wit, the Berkeley Unified School District's investigation and discipline [of] plaintiff for engaging in election fraud during his junior year campaign to become the [BHS] class president." They also argued that the statements were protected as statements made in connection with an issue of public interest (§ 425.16, subd. (e)(4) (section 425.16(e)(4)). They maintained that plaintiff's fraudulent conduct in the school election and the school's disciplinary proceeding were matters of public interest.

Gina's declaration supported the motion. Therein, she stated that she did not learn of the information that she shared in the Dartmouth emails through confidential sources, she was under no obligation of confidentiality, she considered the information she shared with Dartmouth to be of significant public interest, and she believed that hundreds of her school mates were aware of the information about plaintiff. Along with the

5

Dartmouth emails themselves, Gina attached to her declaration an April 2019 news article on the BHS election incident and a transcript from a podcast to which she had provided links in the Dartmouth emails.

In her June 13, 2020, email to admissions and the President's Office at Dartmouth, Gina wrote: "To whom it may concern, [¶] I'm writing to share with you some crucial information about an incoming freshman to your school and a peer of mine, [plaintiff]. I am a senior who just graduated from Berkeley High, and I trust you will keep the source of your information anonymous. [¶] In the spring of 2019, [plaintiff] ran for Student Body President and was found to have cheated in order to win the election. He hacked into over 500 of his peers' emails so they appeared to vote for him. I'm assuming that this is the first you are hearing of this, because my school chose not to leave it on his disciplinary record. (We are a restorative justice-based school.) [¶] If you wish to contact others to verify the credibility of this information, please reach out to John Villavicencio, the Director of Student Activities . . . or . . . the Commissioner of Elections . . . . [¶] I am also attaching several articles that have been written about [plaintiff] with [plaintiff's] name omitted. [¶] I am sharing this with you only so that you are truly aware of whom you have admitted. Because this never impacted his academic record, he has shown no remorse and has yet to take accountability for his actions. This incident is not isolated--it is only one of many instances where [plaintiff] has shown a lack of empathy and character, but this just happened to

6

be the most well-documented. For these reasons, I believe that there are many others who deserve a spot at your prestigious institution far more than he. [¶] Again, for my own safety, please preserve my anonymity. [¶] Thank you, [¶] Gina Ledor." Gina's email included links to articles from April 2019 about the BHS election incident.

The Director of Admissions at Dartmouth replied to Gina's email, stating that Dartmouth took the allegations in the email and potential violations of Dartmouth's standards and expectations seriously, and they would address the matter as appropriate.

On July 4, 2020, Gina emailed the Director of Admissions, "Hi again, [¶] I just wanted to let you know about a new piece from a reputable podcast about [plaintiff] and his election hack. The link is below. [¶] Thank you, [¶] Gina Ledor."

In opposition to the motion, plaintiff argued that: (1) Gina's statements in the Dartmouth emails did not qualify for protection under section 425.16(e)(2) because any official proceedings conducted by BHS had long concluded when Gina sent her emails; (2) Gina's statements did not further a matter of public interest; (3) the statements were collateral and incidental to her larger scheme of misconduct; (4) Gina's conduct was illegal as a matter of law; and (5) plaintiff's claims had minimal merit. Plaintiff argued that, together, Gina, Sheikh, and Namba had harassed and defamed him in 2020 with the Dartmouth emails and messages to incoming Dartmouth freshmen, as well as in

7

2021 through messages sent to third parties on social media platforms.[5]

In support of his opposition, plaintiff submitted his own declaration stating, among other things, that Gina sent the Dartmouth emails, and the restorative justice proceeding stemming from the BHS election concluded in the spring of 2019. He submitted Sheikh's verified discovery responses from a separate DVRO action wherein she admitted that she helped Gina draft the text that Gina put into her first Dartmouth email. Plaintiff also submitted declarations from Parmita Das, who began communicating with plaintiff as a new acquaintance in 2021, and Jen Chen, an elementary school classmate who had not remained in contact with plaintiff. Both Das and Chen stated that they received Instagram messages about plaintiff from Gina in 2021.

In their reply, the Ledors disputed plaintiff's legal arguments, but they also submitted new evidence, including a new declaration from Gina wherein she conceded that she sent

---

[5] Plaintiff identified the alleged statements that served as the basis for his defamation and false light claims in his memorandum of points and authorities in support of his opposition to the motion as those that were pleaded in paragraph No. 24 of the complaint. He also identified the following allegedly defamatory statements: plaintiff "has never shown any regret or given a genuine apology" for an incident that occurred his junior year; "he's incredibly manipulative and abusive"; "he's been harassing people"; "he's . . . an incredibly manipulative liar"; "men like [him] grow up thinking it's ok to disrespect women and be violent"; and plaintiff "recently got kicked off of Bumble because many women who know him spoke up and let Bumble know that someone like him shouldn't be on there."

Instagram messages to Das and Chen in 2021.  The Ledors argued that these 2021 communications were protected under section 425.16(e)(4).  Plaintiff objected to the court's consideration of evidence submitted on reply.

The trial court heard argument, and, after taking the matter under submission, denied the motion.  The court found that the Dartmouth emails were not protected under section 425.16(e)(2) because they had not been made in connection with an issue "under consideration or review," given that the Ledors did not show the official BHS disciplinary proceeding was ongoing when Gina sent her emails.

Next, the court found that the statements were not protected under section 425.16(e)(4).  Here, the court assumed that the BHS election "was a matter of public interest in the first place," but it found that the Ledors failed to show that it remained a matter public interest.  "Moreover, there has been no showing that these private communications contributed to any public debate as required by *Film[O]n.com Inc. v. DoubleVerify[ ] Inc.* [(2019)] 7 Cal.5th [133,] 150]."  The court reasoned that Gina's emails were to the Director of Admissions and their purpose was to affect plaintiff's admission at Dartmouth.  "While the private nature of the communications does not categorically prevent application of [section 425.16](e)(4), it increases the burden of showing that they contributed to the discussion of a public issue.  [Citation.]  Here, aside from the issue of whether there was a qualifying issue of public interest, the evidence is

9

that the focus of [Gina's] emails was a private concern, not the public interest."

As to any alleged 2020 communications to Dartmouth incoming students and 2021 communications to plaintiff's acquaintances, the court did not strike any such allegations because it ruled that the Ledors had not attacked that conduct in their motion. The court did not decide whether plaintiff's claims had minimal merit, and it overruled plaintiff's objections to the evidence supporting the original motion, noting that the exhibits were not considered for the truth of the matter. The court also ruled that it would not consider the Ledors' reply evidence because it was "not relevant" to the court's conclusion that the Ledors failed to show that plaintiff's claims arose from protected activity under section 425.16.

The Ledors filed a timely notice of appeal. (§§ 425.16, subd. (i), 904.1, subd. (a)(13).)

## DISCUSSION

### I. Statutory Context and Standard of Review

The anti-SLAPP statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) As relevant here, section 425.16, subdivision (e) defines an " 'act in furtherance of a person's right

10

of petition or free speech . . . in connection with a public issue' "
as: "(2) any written or oral statement or writing made in
connection with an issue under consideration or review by a
legislative, executive, or judicial body, or any other official
proceeding authorized by law . . . (4) or any other conduct in
furtherance of the exercise of the constitutional right of petition
or the constitutional right of free speech in connection with a
public issue or an issue of public interest." (§ 425.16(e)(2), (4).)

Our review of the trial court's ruling on an anti-SLAPP
motion, including any issues of statutory interpretation
presented on appeal, is de novo. (*Geiser v. Kuhns* (2022)
13 Cal.5th 1238, 1250 (*Geiser*); *1550 Laurel Owner's Assn., Inc. v.
Appellate Division of Superior Court* (2018) 28 Cal.App.5th 1146,
1151 (*Laurel Owner's Assn.*).) A two-step process is utilized.
(*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884
(*Wilson*).) The moving defendant bears the initial burden of
establishing that the allegations or claims " ' "aris[e] from"
protected activity in which the defendant has engaged.
[Citations.] If the defendant carries its burden, the plaintiff must
then demonstrate its claims have at least "minimal merit." '
[Citation.] If the plaintiff fails to meet that burden, the court will
strike the claim." (*Ibid.*)

More specifically with respect to the first step, the
defendant's "burden is to identify the activity each challenged
claim rests on and demonstrate that that activity is protected by
the anti-SLAPP statute. A 'claim may be struck only if the
speech or petitioning activity itself is the wrong complained of,

11

and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson, supra,* 7 Cal.5th at p. 884.)

## II. Protected Activity

On appeal, the Ledors contend that plaintiff's claims arise from two sets of conduct: Gina's statements in the 2020 Dartmouth emails and her 2021 Instagram messages to Das and Chen. We first address the Dartmouth emails and then turn to the 2021 Instagram communications.

### A. The Dartmouth Emails

The Ledors claim protection for the statements in the Dartmouth emails under section 425.16(e)(2), (4). We address both arguments in turn.

#### 1. Section 425.16(e)(2)

The parties do not dispute that the BHS disciplinary proceeding was an "official proceeding authorized by law" (§ 425.16(e)(2)), but the Ledors claim the trial court erred in finding that section 425.16(e)(2) did not apply to Gina's statements because there was no pending official proceeding when she sent the Dartmouth emails in 2020. They assert that

12

section 425.16(e)(2) extends protection to Gina's 2020 statements. We disagree.

The unambiguous language of section 425.16(e)(2) refutes the Ledors' position. (See *Laurel Owner's Assn.*, *supra*, 28 Cal.App.5th at p. 1151 [plain meaning of statutory text governs].) The statute provides protection for "any written or oral statement or writing *made in connection with an issue under consideration or review* by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16(e)(2), italics added.) " 'As used in section 425.16[(e)(2)], a matter is "under consideration" if it "is one kept 'before the mind', given 'attentive thought, reflection, meditation.' [Citation.] A matter under review is one subject to 'an inspection, examination.' " ' " (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 373.) The Ledors argue that an active official proceeding is not required, and that the concluded BHS official proceeding suffices, because the statute does not use the words "pending" or "ongoing." But such language would be redundant. That the statement must be "made in connection with an issue under consideration or review" plainly requires that there be some form of pending consideration of a matter by one of the authorized bodies when the protected statement is made.

Although the Ledors claim there is no authority on this question, a number of cases support our reading of the statute. In *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, the defendant claimed that section 425.16(e)(2) protected

statements relating to an issue reviewed by the city council two years after the statements at issue were made. (*Id.* at pp. 626–627.) Emphasizing section 425.16(e)(2)'s " *'under consideration or review'* " language, the high court disagreed. (*Id.* at p. 627.) "The subdivision thus appears to contemplate an ongoing — or, at the very least, immediately pending — official proceeding. Conversely, if an issue is not presently 'under consideration or review' by such authorized bodies, then no expression — even if related to that issue — could be 'made in connection with an issue under consideration or review.' " (*Ibid.*) While *Rand* addressed statements made before the commencement of an official proceeding, the high court nonetheless recognized that the statutory language contemplates an "ongoing" or "immediately pending" official proceeding. (*Ibid.*) We join courts that have given effect to the statute's plain language. (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1120 [where complaint against plaintiff remained posted on defendant's website after litigation ended, the posting after the litigation's end did not fall within section 425.16(e)(1) or (2)]; *Mandel v. Hafermann* (N.D. Cal. 2020) 503 F.Supp.3d 946, 971–972 [attorney's statements telling client to breach divorce settlement were not connected to an issue "*under review*" because divorce proceeding had concluded when statements were made].)[6]

---

[6] The litigation privilege may be used "as an aid" to interpret section 425.16 (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323), and that privilege has been extended to certain conduct taken to enforce a judgment. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055, 1062–1065 [where claim was based on

We also reject the Ledors' suggestion that denying protection for the statements at issue in this case would violate the purpose of section 425.16(e)(2). "[T]he purpose of subdivision (e)(1) and (2) is essentially to protect the activity of petitioning the government for redress of grievances and petition-related statements and writings (*Briggs* [*v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106*,* 1120–1121])." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 114.) The goal of protecting petitioning activity and participation in official proceedings to seek government redress is not thwarted by recognizing that the statute does not extend to the circumstances here, where Gina's statements were made more than a year after the termination of any official BHS disciplinary proceeding.

---

filing of false proofs of service to obtain default judgment, application for writ of execution and act of levying on property were protected under litigation privilege].) Accordingly, courts have determined that section 425.16, subdivision (e) protects the acts of obtaining an abstract of judgment and recording it as a real property lien. (*O'Neil-Rosales v. Citibank (South Dakota) N.A.* (2017) 11 Cal.App.5th Supp. 1, 6; *see Weeden v. Hoffman* (2021) 70 Cal.App.5th 269, 285 [parties conceded protected activity].) But courts have referred to judgment enforcement proceedings as "an extension of [the] judicial process." (*O'Keefe v. Kompa* (2000) 84 Cal.App.4th 130, 134–135 [discussing litigation privilege]; *Brown v. Kennard* (2001) 94 Cal.App.4th 40, 49 [same].) In contrast, when Gina sent the Dartmouth emails, the BHS disciplinary proceeding had concluded, and the record indicates no related extended proceedings.

## 2. Section 425.16(e)(4)

The analysis of whether the challenged conduct falls within section 425.16(e)(4)'s protection requires two steps. (*FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at pp. 149–150 (*FilmOn*).) "First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates . . . . [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Ibid.*)

With respect to the first step, the statute does not define the terms "public issue" or "issue of public interest." However, to make this determination, "courts look to certain specific considerations such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn*, *supra*, 7 Cal.5th at pp. 145–146.)

*Geiser* recently clarified *FilmOn's* first step. As it did in *FilmOn*, the high court cautioned that speech is rarely " 'about' " any single issue, and it reiterated its critique of cases that had attempted to discern a single topic of speech. (*Geiser*, *supra,* 13 Cal.5th at pp. 1249–1250.) Thus, *FilmOn*'s first step is satisfied "so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute."

(*Geiser*, at p. 1253.) *Geiser* also made clear that this first step requires "an objective inquiry, without deference to the movant's framing or personal motivations," although those components may inform the analysis if objectively reasonable. (*Id.* at p. 1254.) "If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step." (*Geiser*, at p. 1254.)

*FilmOn*'s second step "moves from a focus on identifying the relevant matters of public interest to addressing the specific nature of defendant's speech and its relationship to the matters of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 152.) Because "virtually always, defendants succeed in drawing a line — however tenuous — connecting their speech to an abstract issue of public interest," section 425.16(e)(4) "demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*FilmOn*, at p. 150.) " '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Ibid.*)

"What it means to 'contribute to the public debate' [citation] will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant — through public or private speech or

17

conduct — participated in, or furthered, the discourse that makes an issue one of public interest." (*FilmOn*, *supra,* 7 Cal.5th at pp. 150–151; see also p. 154 ["a court must consider whether a statement . . . contributes to or furthers the public conversation on an issue of public interest"].)

Together, *Geiser* and *FilmOn* instruct that context plays an equally important role as the content of the speech at issue, and context must be considered at both of *FilmOn*'s steps. (*Geiser, supra,* 13 Cal.5th at p. 1256; *FilmOn, supra,* 7 Cal.5th at pp. 151–154.) Contextual considerations include "the identity of the speakers or participants," the "location and audience," and its "purpose and timing." (*Geiser,* at p. 1253.) At *FilmOn*'s first step, " 'Language . . . cannot be interpreted apart from context' [citation], and what a particular statement or act is 'about' often cannot be discerned from words alone." (*Geiser,* at p. 1252.) And at *FilmOn*'s second step, "the inquiry of whether a statement contributes to the public debate is one a court can hardly undertake without incorporating considerations of context — including audience, speaker, and purpose." (*FilmOn,* at p. 152.)

In *Geiser*, our high court determined that section 425.16(e)(4) protected a sidewalk demonstration "to protest a real estate company's business practices after the company evicted two long-term residents from their home." (*Geiser, supra,* 13 Cal.5th at p. 1243.) The genesis of the demonstration was an individual family's eviction, but around 25 people protested in front of the home of the evicting corporation's chief executive

18

officer in an event sponsored by an advocacy organization committed to "fight[ing] against the displacement of long[-]term residents" and "sav[ing] homes from foreclosures." (*Id.* at pp. 1243–1244, 1251.) The appellate court held that the demonstration "focused on . . . a private matter concerning a former homeowner and the corporation that purchased her former home," and not on "any societal issues of residential displacement, gentrification, or the root causes of the great recession." (*Id.* at p. 1250.) Our Supreme Court disagreed. "We do not see why defendants' expressive activity fits only one characterization and not both." (*Id.* at p. 1250.) The court reasoned: "It is common knowledge that foreclosures, evictions, and inadequate housing are major issues in communities throughout California, and the participation of more than two dozen members of an advocacy group dedicated to fighting foreclosures and residential displacement must be considered against that backdrop." (*Id.* at p. 1251.) The high court held that the speech implicated a public issue even though it could also be understood to "implicate a private dispute." (*Id.* at p. 1253.)

In *FilmOn*, in contrast, the allegedly disparaging statements made in confidential reports that the defendant disseminated to clients were not protected by section 425.16(e)(4). (*FilmOn*, *supra*, 7 Cal.5th at pp. 140.) There, the defendant was a "for-profit business entity that offers online tracking, verification and 'brand safety' services to Internet advertisers," and the plaintiff owned websites that the defendant identified in its reports as containing "adult content" or "copyright

19

infringement" material. (*Id.* at pp. 140–142.) With respect to *FilmOn*'s step one, the defendant argued that the presence of adult content on the internet, generally, and the presence of copyright infringing content on the plaintiff's website, specifically, were matters of public concern. (*Id.* at p. 150.) It submitted evidence that the plaintiff had been subject to media reports of infringing content on its websites and copyright litigation over its streaming model to support its latter argument. (*Id.* at pp. 150, 152.) The high court acknowledged that the reports in the abstract could implicate issues of public interest (*id.* at p. 152), but ultimately it determined that the reports did not contribute to the public debate on such issues. (*Id.* at pp. 152–153.) The reports were made "privately, to a coterie of paying clients," who used them "for their business purposes alone. The information never entered the public sphere, and the parties never intended it to." (*Id.* at p. 153.) Accordingly, the reports were "too remotely connected to the public conversation about [the implicated public] issues" to come within the protection of the anti-SLAPP statute. (*Id.* at p. 140.)

The Ledors argue that the Dartmouth emails implicate issues of public interest — the BHS election incident, including plaintiff's role therein, as evidenced by the 2019 media coverage and the podcast, and the issue of restorative justice. In applying the above-outlined body of law to the present case, we need not decide whether Gina's speech "implicate[s] issues of public interest" (*Geiser*, *supra*, 13 Cal.5th at p. 1252) — because even assuming that it does, the Ledors have not satisfied the second

20

part of the test.  They have not shown that Gina's speech "contribute[d] to or further[ed] the public conversation on an issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 154.)

First, the speech at issue occurred in private.  Gina sent two emails to school officials at their Dartmouth email addresses. Although our Supreme Court stresses that "no single element is dispositive" (*FilmOn*, *supra*, 7 Cal.5th at p. 153) in determining whether a defendant's speech is entitled to protection, the private context "makes heavier" the defendant's "burden of showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of [section 425.16](e)(4)." (*Wilson, supra*, 7 Cal.5th at p. 903.)

Second, nothing in the record indicates that Dartmouth, a college, used Gina's statements for anything other than its private purposes.

Third, there is no evidence that Gina intended the Dartmouth emails to reach the public sphere.  Gina sent the emails more than a year after the BHS election incident and the conclusion of the restorative justice proceeding, and the evidence before the court showed that defendant Sheikh assisted in drafting the content of Gina's first email at a time when plaintiff attempted to end his relationship with Sheikh.  In her own words, Gina shared the information "only so that" Dartmouth was "truly aware of whom [it had] admitted."  Gina also wrote that the BHS election incident "just happened to be the most well-documented" of many instances where plaintiff had shown a

21

"lack of empathy and character," and she opined that many others deserved a spot at Dartmouth "far more than [plaintiff]." The content of Gina's speech objectively suggests that she shared the information not to "further[] public discussion" of the BHS incident or of restorative justice (*Geiser, supra,* 13 Cal.5th at p. 1256), but instead merely to provide an example for Dartmouth of plaintiff's lack of good character for Dartmouth's private purposes only. Thus, both the content and context of the emails at issue show they were not intended for a wide public audience.

Finally, there is no evidence that the Dartmouth emails ever reached a wider public audience.

In sum, then, with her private emails intended only for Dartmouth's private use, Gina's emails to Dartmouth officials did not further or contribute to a larger public conversation (even assuming such a conversation existed at the time[7]). (*FilmOn*, *supra*, 7 Cal.5th at p. 154.)

---

[7] The news article *in the record* about the BHS election and the links Gina sent to Dartmouth, which is the only evidence we consider (though not for the truth of the matters alleged therein given the court's unchallenged ruling below), are from April 2019. The Ledors claim that the existence of the July 2, 2020, podcast shows that the public discussion of the BHS election incident was "ongoing and nationwide" when Gina sent the Dartmouth emails. The Ledors make many representations in their briefing about this alleged "popular podcast," its alleged influence, and the alleged "award-winning podcast company" that produced it. Those representations are not evidence, and they are entirely unsupported. The only evidence in the record regarding the podcast is from Gina's declaration and its attached transcript. Gina states therein that there was a podcast covering the BHS election incident, and "[a]ttached hereto as Exhibit C is a true and accurate copy of a transcript of a recording to which I linked

The Ledors rely heavily on *Geiser*, but *Geiser* is distinguishable. There, the defendants participated in a sidewalk demonstration with 25 to 30 strangers organized by an advocacy group that fought against the displacement of long-term residents. (*Geiser*, *supra*, 13 Cal.5th at pp. 1244–1245, 1251.) Multiple police officers and an observer from the National Lawyers Guild were present as well, and the protest received media attention. (*Id.* at pp. 1245, 1255.) Our high court found the protest had dual purposes to facilitate repurchase of the defendants' foreclosed home and to draw attention to the alleged unfairness of the business practices by which the defendants were foreclosed upon and evicted. (*Id.* at p. 1255.) In light of the latter purpose and the context, the public sidewalk protest furthered the public discussion of public issues. (*Ibid.*) No similar facts exist here.

This case is instead, albeit without the for-profit corporate speaker, more analogous to *FilmOn*, wherein the plaintiff's copyright infringement was presumed to be a public issue, the defendant identified the plaintiff's websites as providing improper access to copyrighted materials[8] in its reports to clients,

---

in my email to Dartmouth: a July 2, 2020 podcast on "Reply-All" by PJ Vogt under "gimletmedia" entitled "#163 Candidate One." The 44-minute recording can be accessed at: https://gimletmedia.com/shows/reply-all/76h63r."

[8] The *FilmOn* defendant's tag for " 'Copyright Infringement: Streaming or File Sharing' " meant " ' " 'Sites, presently or historically, associated with access to or distribution of copyrighted material without appropriate controls, licensing, or permission; including but not limited to, sites electronically

but the high court nonetheless held that the reports, which were not intended to, and did not, enter the public sphere, did not contribute to the public discussion on a matter of public interest in a manner sufficient to warrant protection under section 425.16(e)(4). (*FilmOn*, *supra*, 7 Cal.5th at p. 153.)

### B. 2021 Instagram Communications to Das and Chen

On appeal, the Ledors assert that Gina's 2021 Instagram communications to Das and Chen are protected under section 425.16(e)(4). But because they fail to demonstrate error in the trial court's ruling that their motion to strike did not address any allegations regarding Gina's 2021 communications to plaintiff's acquaintances, the Ledors have not established a basis for reversal of the trial court's order.

To prevail on appeal, the Ledors " 'must establish both error and prejudice from that error. [Citation.] In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when . . . [appellant makes] conclusory arguments that are not supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn. (*2021) 66 Cal.App.5th 583, 597; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 [" 'In order to demonstrate error, an appellant must

---

streaming or allowing user file sharing of such material.' " ' " (*FilmOn*, *supra*, 7 Cal.5th at p. 141.)

supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)

The Ledors have not properly presented this issue on appeal. They do not cite the standard by which we should review the trial court's determination that their motion did not seek to strike allegations regarding Gina's 2021 Instagram communications. They do not cite any law establishing error in the court's ruling, and, with the exception of a few cursory sentences (one of which is in a confusing footnote), they do not even attempt to show error. Given that the Ledors failed to make a cogent argument that would justify a reversal of the court's finding that they did not properly move to strike the allegations regarding Gina's 2021 Instagram messages to Das and Chen, they have not established that the court erred by failing to strike those allegations.

Because the Ledors have failed to show that plaintiff's allegations arise from activity protected under section 425.16, we need not consider the parties' additional arguments, including those regarding whether plaintiff demonstrated a probability of prevailing on the merits of his claims.

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Plaintiff shall recover his costs on appeal.

BROWN, P. J.

WE CONCUR:

STREETER, J.
HIRAMOTO, J.*                                  *Doe v. Ledor et al.*  (A165224)

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Alameda County Superior Court

Trial Judge:        Hon. Stephen Kaus

Counsel:            Law Office of Jeremy Friedman, Jeremy Friedman
                    Defendants and Appellants.

                    Moya Law Firm, Mario A. Moya, Rebecca M. Hoberg for
                    Plaintiff and Respondent.